NOTICE
Decision filed 12/01/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250526-U

NO. 5-25-0526

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* ROGHAN A., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Wayne County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-JA-4 |
| | ) | |
| Brady I., | ) | Honorable |
| | ) | Melissa A. Morgan, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Sholar and Bollinger concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The circuit court's finding that the respondent father was an unfit parent was not against the manifest weight of the evidence.

¶ 2     The respondent, Brady I. (Father), appeals the circuit court of Wayne County's May 30, 2025, order finding him unfit as a parent and June 18, 2025, order finding it in the best interest of Father's biological minor child, Roghan A., to terminate his parental rights. Father argues on appeal that the circuit court's order finding him unfit was against the manifest weight of the evidence. For the following reasons, we affirm.

1

¶ 3                              I. BACKGROUND

¶ 4      On February 8, 2021, the State filed a petition for adjudication of wardship due to allegations of neglect, pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2020)). The petition included Madison A. as the mother (Mother) and Michael S. as the father. The petition alleged that Roghan, born September 2017, was neglected because the parents provided an environment injurious to the welfare of Roghan due to evidence of recent methamphetamine use, instability for both parents in employment and housing, and multiple injuries to Roghan in the same area with different stages of healing. The circuit court entered an agreed order for temporary shelter care on the same day, which found that Roghan should be placed in the care of the Department of Children and Family Services (DCFS) immediately.

¶ 5      On March 15, 2021, a docket entry shows that Roghan's father was not Michael S. and the circuit court removed him from the proceedings. The circuit court then changed the father in the case to "unknown." During a hearing on May 4, 2021, the State said that in mid-March, Mother identified Brady as the father of Roghan, but did not "know how far we've *** gotten on that." At the same hearing, the parties stipulated to the allegations of neglect stated in the petition, and the circuit court entered an order of continuance under supervision pursuant to section 2-20 of the Act.[1] 705 ILCS 405/2-20 (West 2020). The order listed the father as unknown.

¶ 6      On July 7, 2021, the State requested permission to serve process on "Any and All Unknown Fathers" by publication. On July 12, 2021, the notice was published in the local newspaper, stating that the hearing on the petition to declare Roghan a ward of the court would be held on September

_____

[1]The circuit court entered a *nunc pro tunc* order vacating the May 4, 2021, order, stating that no stipulation was made by the parents as to the facts alleging neglect. However, on March 1, 2022, upon agreement from the parties, the circuit court reinstated the order for continuance under supervision.

7, 2021. The notice was filed with the court on July 21, 2021. During the hearing on September 7, 2021, Father was not present. Lutheran Child and Family Services (LCFS), on behalf of DCFS, filed its first permanency hearing report prior to this hearing. LCFS and DCFS continued filing reports on Mother's progress, but Father was not included in any of the reports or proceedings.

¶ 7    On February 10, 2023, the State filed a "Petition to Revoke Orders of Continuance under Supervision." The petition alleged that Mother did not cooperate with DCFS and did not complete the required services.

¶ 8    At a status hearing on March 7, 2023, the circuit court said, "We've got one absent Father. Is that Father deceased or just not participating?" The State responded, saying, "[W]e have had a name in the past. We have had DNA ordered, but we've never been able to find him."

¶ 9    In a status report filed on September 15, 2023, DCFS stated that Brady I. is the father of Roghan and resides in Indiana, but he has had no contact with the agency during the case. A diligent search was completed, and DCFS mailed a letter to Father at an address in Vincennes, Indiana, on July 24, 2023. DCFS received no response from Father.

¶ 10    On January 12, 2024, the State withdrew its "Petition to Revoke Orders of Continuance under Supervision." At the same hearing, the State presented an agreed adjudicatory order. Pursuant to the agreement, Mother stipulated that Roghan was abused or neglected and that Roghan was in an environment injurious to his welfare. The circuit court entered the agreed adjudicatory order based on the stipulation. In this order, however, the circuit court stated that the putative father has never been located.

¶ 11    A second diligent search for Father was completed on January 3, 2024, and a letter was sent to Father. This time, Father called the caseworker and left a voicemail on January 20, 2024, as well as sent an email, to which the caseworker followed up and informed Father of the next

hearing date of February 2, 2024. Father was present at the dispositional hearing, but did not enter an appearance. During the hearing, the caseworker requested DNA testing to establish paternity in this case. The circuit court did not make a finding regarding Father, as paternity had not yet been established. The circuit court entered an agreed order finding Mother unfit due to her failure to complete services, and that unknown fathers were unwilling to care for Roghan. As such, the circuit court adjudicated Roghan as neglected and made him a ward of the court. Father complied with the circuit court's order for DNA testing, and on April 3, 2024, DCFS filed the results, confirming that Father is Roghan's biological father.

¶ 12    On July 26, 2024, Mother surrendered her parental rights to Roghan and consented to his adoption by his foster parents. During the hearing, the parties stipulated to a permanency order, as to Father, with a goal of return home within 12 months. The order found that Father has not made reasonable progress or efforts toward returning Roghan home because Father knew of Roghan, but only started services on July 25, 2024. During its oral pronouncement, the circuit court said, "[Y]ou've not been in the picture and you knew this child was alive. You knew there was a potential that you were the Father because you had a relationship at that time."

¶ 13    On September 30, 2024, the State filed a motion to terminate Father's parental rights. The motion alleged that Father is unfit for the following reasons: (1) abandonment of the child (750 ILCS 50/1(D)(a) (West 2024)); (2) failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (*id.* § 1(D)(b)); (3) desertion of the child for more than three months next proceeding the commencement of the adoption proceeding (*id.* § 1(D)(c)); (4) failure to protect the child from conditions within his environment injurious to the child's welfare (*id.* § 1(D)(g)); (5) failure by the parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during a nine-month period following the

adjudication of the neglected minor (*id.* § 1(D)(m)(i)); and (6) failure by the parent to make reasonable progress toward the return of the child from the parent during a nine-month period following the adjudication of the neglected minor (*id.* § 1(D)(m)(ii)).

¶ 14    The matter proceeded to a hearing on the unfitness of Father on February 21, 2025. The State called Father as a witness. He testified that he lived with Mother in Indiana between May 2016 and June 2017. Mother became pregnant during this time and repeatedly told him that he was the father. Father said there was "a high chance" that he was the father, but he wanted a DNA test to confirm. Mother and Father separated in June 2017, and Father moved in with his mother, but he continued to attend prenatal medical appointments with Mother because "there was still a high belief that I thought he was mine." Father continued attending the appointments until mid-August because Mother did not want him there. Father did not know where Mother was living at the time, and he did not ask her because he stated, "It was none of my concern at that time."

¶ 15    Mother gave birth in September 2017, but Father did not attend the birth of his son because he was not informed, and Mother blocked all forms of communication. Father knew of her due date and that she could be induced, but when Father tried to call Mother around her potential induction date, he was unable due to Mother blocking any calls. Father knew which hospital Mother would deliver Roghan, but did not go to the hospital to check for any updates because it "didn't cross [his] mind" to do that. In mid-to-late October, Father learned of Roghan's birth from a friend who had seen a Facebook post about it. Father was unable to call Mother's phone number or contact her online, as Mother had restricted his communication with her.

¶ 16    In January 2018, Father served a jail sentence in Indiana for pleading guilty to a theft charge, and he was released in September 2018. Through a friend, Father contacted Mother roughly two weeks after he was released from jail. Mother drove Roghan from Illinois, where she

5

and her husband lived, to Indiana that same night to meet Father. Father spent time with Roghan and drove around with him and Mother that evening, then Father drove the three of them back to Mother's home in Illinois. Father stayed the night, and the next day, the police arrived at the house because Mother's husband reported the truck stolen, as the couple was in the process of separating. Father went out the back door and left the home after the police arrived.

¶ 17     The next time Father saw Roghan was roughly a month later, in November 2018, as Mother came to Indiana and stayed with Father's mother, Melissa. During this visit, Father noticed that Roghan looked like him, and he saw the "resemblance." Father requested a paternity test during this time, but it "always turned into an argument" with Mother.

¶ 18     Father video-called with Roghan when he could and saw him again in January 2019. Mother came to Indiana again to stay with Melissa. She stayed for a couple of weeks, then left for her mother's house in Fairfield in March 2019. Mother wanted Father to come with her to Fairfield, but he stated that he had an appointment he could not miss. Father knew how to keep in contact with Mother and Roghan. Father sent Mother money for diapers and placed orders at the Fairfield Walmart for Mother to pick up. Father assumed that Mother lived in Fairfield with her mother for the remainder of 2019, but he did not see Roghan again until the end of the year.

¶ 19     At the end of 2019, Melissa received a phone call from the Illinois State Police, informing her that Mother was staying at a known drug house with Roghan, and the police wanted them to be somewhere safe. Melissa picked them up in Lawrenceville, Illinois, and they stayed with her for several months in 2020. At the time, Father lived close by with his girlfriend, and he would see Roghan every other day. When Father was too busy or the weather was bad, he would not see Roghan. Melissa then moved to Wisconsin for several weeks, and when she returned, Mother and Roghan left. Father did not know she left or where she went with Roghan.

¶ 20    Father did not have any additional contact with Mother after she left because she frequently changed her phone number and social media accounts. In July or August 2020, Father attempted to file paternity paperwork in Indiana, but did not complete it because he did not know where Mother lived. Father did not reach out to any of Mother's friends or family, and did not travel to Illinois to find Mother or Roghan. Father continued reaching out through social media to Mother about Roghan, but would not receive responses from Mother. Father never contacted an attorney or attempted to file anything further. After this point, Father was out of Roghan's life and did not know where he was.

¶ 21    Father stated he was "concerned" after the incident with Mother and Roghan at the drug house, but he did not have any further contact with them. Father stated, "I was [concerned], but I was not asking the right people the right questions." Father said, "I should have probably gone to a courthouse or tried to seek out a lawyer and ask them."

¶ 22    Father stated that he kept his mailing address at his father's apartment in Indiana, but he did not receive any information from DCFS until January 2024. At that point, he contacted the caseworker and showed up for the next hearing date. Father stated he was informed that Roghan was in foster care for possible abuse, but Father was unsure because he was "not involved in that." Father stated, "I admit that that's wrong on my part for not trying harder. I do. I admit that I made mistakes on the way that I went about things in the past." Father described his visits with Roghan and said he believed Roghan's foster family, Kelsey and Scott G., seemed to be taking care of him. Father did say he believed that he had a bond with Roghan since he started visits.

¶ 23    On cross-examination from Father's counsel, Father described his employment history, that he was presently employed, and was able to pay for Roghan's needs. Father completed the recommended services from DCFS. When asked about his efforts in locating Mother and Roghan,

Father said, "I probably could have done a lot more to try for it." However, once paternity was established, Father did everything he could to establish a relationship.

¶ 24    On cross-examination from the guardian *ad litem*, Father stated that he did not go to Illinois to attempt to find Mother and Roghan, despite knowing locations where Mother might have gone, including where her mother lived. Father admitted that he could have "tried a little bit harder" to locate them.

¶ 25    On examination from the court, Father said he knew who Mother's mother was, her name, and what city she lived in, but not her exact address. Father also stated that he did not receive the first letter, which DCFS sent to his father's home.

¶ 26    On reexamination from the State, the State admitted a letter dated July 24, 2023. The letter was addressed to Father at his father's apartment address in Indiana, but Father testified he never received it. Father testified that he received the letter from DCFS in January 2024. The State called no further witnesses.

¶ 27    Father then called Katherine McDaniel, the DCFS caseworker assigned to Roghan's case. McDaniel testified that when the case originated in April 2020, there was no father listed for Roghan. In 2023, McDaniel learned that Mother informed a supervisor during a visit that Father was Roghan's biological father. McDaniel then completed a diligent search in July 2023 and mailed a letter to Father. She sent a follow-up letter via certified mail to Father in January 2024, but did not receive a response. Father then called McDaniel on January 20, 2024, and became involved in the case. Father completed all services requested, but a home visit was not completed because Father lived in Indiana and additional steps had to be taken. McDaniel stated that the visits between Roghan and Father went well. Father presented no further witnesses.

¶ 28 The circuit court took the matter under advisement and entered an order on May 30, 2025. The order stated that the court found, by clear and convincing evidence, that Father is an unfit parent for the following reasons: (1) abandonment of the child; (2) failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare; (3) desertion of the child for more than three months next preceding the commencement of the adoption proceeding; and (4) failure to protect the child from conditions within his environment injurious to the child's welfare (750 ILCS 50/1(D)(a)-(c), (g) (West 2024)).

¶ 29 The matter proceeded to a best interest hearing on June 11, 2025, and on June 18, 2025, the circuit court entered an order terminating Father's parental rights. As Father does not challenge the finding from the best interest hearing, we will not address the facts here. Father timely appealed on June 30, 2025.

¶ 30                                  II. ANALYSIS

¶ 31 On appeal, Father asks this court to reverse the circuit court's finding that he is an unfit parent. He argues that the circuit court erred in finding him unfit because the State failed to prove, by clear and convincing evidence, that Father was unfit due to (1) abandonment of the child; (2) failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare; (3) desertion of the child for more than three months next preceding the commencement of the adoption proceeding; and (4) failure to protect the child from conditions within his environment injurious to the child's welfare (*id.*). Father does not challenge the best interest finding. The State argues that the circuit court properly found Father unfit because while Father knew Roghan was highly likely his child, he failed to protect and support his child, and did not establish a relationship with the child. We agree with the State.

9

¶ 32    Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2024)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2024).

¶ 33    The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). 705 ILCS 405/2-29(2), (4) (West 2024); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds that the parent is unfit, the matter proceeds to a second hearing, at which the State must prove that termination of parental rights is in the best interests of the child. 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d at 352.

¶ 34    Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re D.T.*, 212 Ill. 2d at 364. Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *Id.* A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). In addition, because each of the statutory grounds of unfitness is independent,

the circuit court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 218 (2002).

¶ 35 Section 1(D)(b) of the Adoption Act provides that a parent may be found unfit for "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2024). Since the language of the statute is in the disjunctive, any one of the three individual elements, *i.e.*, interest *or* concern *or* responsibility, may be considered by itself as a basis for unfitness. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31; 750 ILCS 50/1(D)(b) (West 2024). In determining whether a parent has shown a reasonable degree of interest, concern, or responsibility for a minor's welfare, a court considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare. *In re Daphnie E.*, 368 Ill. App. 3d at 1064. Completion of service plans may also be considered evidence of a parent's interest, concern, or responsibility. *Id.* at 1065. The court must focus on the parent's efforts, not his or her success. *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990). In this regard, the court examines the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred. *Id.* at 278. We are mindful, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). Rather, the interest, concern, or responsibility must be objectively reasonable. *In re Daphnie E.*, 368 Ill. App. 3d at 1064.

¶ 36 The circuit court's written order finding Father to be an unfit parent describes its ruling in great detail. As to maintaining a reasonable degree of interest, the court found:

"He failed to maintain a reasonable degree or [*sic*] interest, concern, or responsibility as to the child's welfare when he failed to establish his parental rights throughout the minor's life, especially following the incident in 2020 when his contact with Mother and the minor

11

child ceased. The Court heard no evidence that Father ever expressed a degree of interest, concern, or responsibility during the period following the incident in 2020 until January 2024—over 3 and a half years (half the life of the minor child). He took no action to express concern or responsibility, even when letters were being directed to his address, until his contact with the caseworker in January 2024."

¶ 37 While Father did not establish paternity until April 2024, he knew it was more than likely that Roghan was his child because he had a relationship with Mother during the time the mother became pregnant. Father even attended prenatal appointments with Mother until shortly before Roghan's birth. Father stated that due to disagreements with Mother, he did not know when Roghan was born. Father knew, however, of the hospital where Mother was to be induced and give birth, but it did not "cross [his] mind" to inquire at the hospital of his son's birth. Father did not meet Roghan until September 2018, when Roghan was one year old. Father maintained sporadic contact with Roghan until March 2020. In 2020, the Illinois State Police informed Melissa, Father's mother, that Mother was found at a known drug house with Roghan. Mother then lived with Melissa until March 2020, when she and Roghan left. Father had no contact with Roghan from March 2020 until January 2024. Father himself stated that he could have "tried a little bit harder" to locate Mother and Roghan after they moved back to Illinois.

¶ 38 Father knew that Mother took Roghan to a drug house, and the police were involved, yet whenever she left with Roghan, Father did not locate them. Father messaged Mother online and attempted to file a paternity case in Indiana, but abandoned the case when he did not know Mother's address. When asked about his concern for Roghan after he left in 2020, Father said that he was concerned, but he asked the "wrong people" about how to get help. Father did not take the initiative to locate his child despite these concerns and gave up on looking for Roghan entirely

12

until receiving a letter from DCFS in January 2024. As the circuit court stated, for more than half of Roghan's life, Father did not have contact with Roghan and by his own admission did not try very hard to find him. In light of the evidence presented to, and considered by, the circuit court, the circuit court did not err in finding that Father failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare.

¶ 39     Evidence of a single statutory ground is sufficient to uphold a finding of parental unfitness. *In re T.Y.*, 334 Ill. App. 3d 894, 905 (2002). Thus, the circuit court's finding that Father failed to maintain a reasonable degree of interest, concern, and responsibility is sufficient to support the finding that he was an unfit parent. We again note that Father does not challenge the circuit court's finding that it was in the child's best interests that his parental rights be terminated, and so that finding is also affirmed. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued are forfeited).

¶ 40                                III. CONCLUSION

¶ 41     For the foregoing reasons, the June 18, 2025, judgment of the circuit court of Wayne County that terminated Father's parental rights to Roghan is hereby affirmed.

¶ 42     Affirmed.

13