NOTICE

Decision filed 03/02/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250785-U

NOS. 5-25-0785, 5-25-0786, 5-25-0787, cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARCUS C., McKAYLA C., and DAKOTA C., Minors | ) ) ) | Appeal from the Circuit Court of Champaign County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | Nos. 23-JA-59, 23-JA-60, 23-JA-61 |
| Stephanie P., | ) ) | Honorable Robert E. Jacobson, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Sholar and Bollinger concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court's order terminating Mother's parental rights was not against the manifest weight of the evidence where the State met its burden of proving that Mother was unfit to parent and that termination was in the best interest of the minors. Therefore, the circuit court's orders making a finding of unfitness and terminating parental rights are affirmed.

¶ 2    The respondent, Stephanie P. (Mother), appeals the orders of the circuit court of Champaign County terminating her parental rights to her three minor children.[1] She argues that

_____

[1]Mother filed separate appeals in each of the minors' cases. This court ordered her appeals consolidated under the case number for Marcus's case.

1

the circuit court's orders finding her unfit and terminating her parental rights were against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                              A. Case Reports and Timeline

¶ 5    On April 20, 2023, the State filed a petition for adjudication of abuse, neglect, or dependency. The petition named Mother and Philip C. (Father) as parties and the parents of Marcus C. (born July 2011), McKayla C. (born May 2016), and Dakota C. (born March 2018).[2] Count I of the petition alleged that the minors were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2020)) due to being in an environment injurious to their welfare in that the environment exposed the minors to substance abuse and domestic violence. Count II alleged that the minors were neglected pursuant to section 2-3(1)(b) of the Act (*id.*) due to being in an environment injurious to their welfare in that the parents failed to correct the conditions which resulted in a prior adjudication of the parental unfitness to exercise guardianship and custody of the minors in Champaign County case Nos. 19-JA-68 and 22-JA-127.

¶ 6    The Department of Children and Family Services (DCFS) filed a shelter care report the same day. The report stated that the minors were taken into protective custody on April 18, 2023, after a hotline call reported that Father and his mother, Debra, were intoxicated and engaged in a verbal argument with Mother and her mother, Shirl. Father was arrested for domestic battery. Additionally, on March 23, 2023, Marcus and McKayla were interviewed at school about marks on their body, which resulted in a DCFS report stating that Father hit the minors and left marks on them. Father denied any involvement, and stated the injuries came from the minors "play wrestling."

---

[2]Father is not a party to this appeal.

¶ 7    The circuit court held a shelter care hearing the same day. Mother did not appear, but the order states that Father knowingly, understandingly, and voluntarily agreed to a temporary order placing the custody of the minors with DCFS, and that it was in their best interest. The order considered the shelter care report as the factual basis for temporary custody.

¶ 8    On June 23, 2023, the circuit court held the adjudicatory hearing. During the hearing, Father admitted and stipulated to count I of the petition. The hearing was continued until June 27, 2023, at which time, Mother admitted and stipulated to count II of the petition. The circuit court accepted the admissions and stipulations. As to count II, the factual basis included that Mother had two prior juvenile cases. Champaign County case No. 19-JA-68 involved the same minors as the present case, and case No. 22-JA-127 involved the minors' half sibling. In case No. 19-JA-68, the case was closed on April 13, 2021, and the minors were returned to the care of Father because Mother remained "unfit and unable to exercise custody and guardianship." Case No. 22-JA-127 was still ongoing, and Mother had not been restored to fitness to safely exercise custody. The order found the minors to be neglected pursuant to section 2-3(1)(b) of the Act.

¶ 9    On July 19, 2023, Lutheran Social Services of Illinois (LSSI), on behalf of DCFS, filed a dispositional report. Mother completed her integrated assessment. The report stated that Mother was living in Rantoul, Illinois, with her paramour, Jessie J., and their infant child, Severide, who was the child involved in the open case (case No. 22-JA-127). Mother was screened for services for substance abuse, mental health, parenting, and domestic violence. Mother participated with another agency, One Hope United (OHU), for her other pending DCFS case. LSSI confirmed with OHU that Mother completed a parenting course, and it was waiting for confirmation of Mother's participation in substance abuse and mental health assessments. Mother was to complete a random

drug test, but she failed to appear. Additionally, she was recommended to complete domestic violence counseling.

¶ 10 As to visitation, Mother was granted unlimited third-party visitation with maternal grandparents, but Mother and Shirl did not adhere to the schedule, and the visits were changed to two hours weekly. Mother did not confirm any scheduling requests. The minors stated that it was good to see Mother, as they had not had frequent contact since the 2019 DCFS case.

¶ 11 The circuit court held a dispositional hearing on August 15, 2023. The court considered the dispositional report filed by DCFS. The court found that it was in the best interests of the minors that they be made wards of the court and adjudicated neglected; that Mother and Father were unfit and unable for reasons other than financial to care for, protect, train, or discipline the minors; and the health, safety, and best interest of the minors will be jeopardized if the minors remain in the custody of the parents. The order made a specific finding as to Mother, stating,

"[Mother] remains unfit to safely exercise custody of the minors' sibling in Champaign County Case No. 22-JA-127 for reasons that apply equally to the children in this case. Her pattern has been one of unhealthy relationships with men who present a danger to her children and then a failure to appreciate the problem and take action to protect the children. She fears abandonment and tends to be susceptible to manipulation and mistreatment, leading her to minimize risks and to view perpetrators as victims who have been falsely accused. She is working on addressing this problem and has made efforts and progress but is not yet restored to parental fitness. In addition, for these three children, respondent mother has had limited contact with them since January 2021, when they were returned to the custody of respondent father. Her relationships with them have suffered damage that must be repaired before she would be able to safely exercise custody."

4

The circuit court adjudicated the minors neglected, made them wards of the court, and granted custody and guardianship to the Guardianship Administrator of DCFS.

¶ 12    LSSI filed a permanency review report on September 13, 2023. The report stated that the agency had not been able to complete a home visit despite scheduling attempts. For services, LSSI received a completion certificate for Mother's parenting class from OHU. While LSSI requested proof of completion for her substance abuse and mental health assessment, it had not been received yet. Mother had two scheduled drug drops; she failed to appear for one and tested negative for the other. A referral had been made for Mother to receive domestic violence counseling. Visitation was still scheduled for two hours a week.

¶ 13    The circuit court held a permanency hearing on September 19, 2023. Mother appeared with counsel. The court considered the service plan, LSSI report, and testimony of witnesses. The court entered an order finding that the goal was return home within 12 months, and that Mother made reasonable and substantial progress, and made reasonable efforts toward returning the minors home.

¶ 14    LSSI's December 15, 2023, permanency review report noted for services, that LSSI received completion certificates from OHU for Mother's substance abuse and mental health assessments. She was not recommended for any further treatment. As to parenting, Mother completed a parenting course, but LSSI was looking into additional resources for her due to concerns about her ability to understand and address past traumas. Mother was completing weekly video sessions for domestic violence, and the report noted that the minors stated Mother received a physical mark from Jessie, but Mother denied this. LSSI stated it had concerns about whether Mother was being forthcoming about her domestic violence history. Mother was also scheduled to complete a chaperone class.

5

¶ 15    As to visitation, it was scheduled for two hours a week, along with the minors' maternal grandparents and Mother's child, Severide. Jessie was not permitted to attend visits, and as such, Mother canceled one visit. She canceled another visit as well due to wanting "space" after discovering McKayla was admitted for a psychiatric hospitalization.

¶ 16    The Court Appointed Special Advocate (CASA) and guardian *ad litem* (GAL), Minh Aimone, filed a report on December 18, 2023, detailing the progress of the minors and any concerns about their well-being. The report stated that Mother engaged in conversations with the minors that could cause "long-term psychological harm" to them. The report specifically stated that Mother "[threatened] the child about sending [McKayla] back to a facility where she received care" and that such a statement "is not appropriate but detrimental to the child." The CASA/GAL recommended that Mother should participate in further parenting programs as well as trauma-informed workshops.

¶ 17    The circuit court held a permanency hearing on December 19, 2023. Mother appeared. The court considered the service plan and reports filed from LSSI and the CASA/GAL. The goal remained return home within 12 months. The court found that Mother made reasonable and substantial progress and made reasonable efforts toward returning the minors home.

¶ 18    The CASA/GAL filed a report on March 12, 2024, detailing the minors' progress and concerns for their well-being. The report again recommended that Mother participate in a parent coaching program.

¶ 19    LSSI's March 15, 2024, permanency review report noted that Mother completed substance abuse, mental health, parenting, domestic violence, and chaperone class services. Visitation continued at two hours per week, and Jessie was now involved in the visits.

¶ 20    The circuit court held a permanency hearing on March 19, 2024. Mother did not appear. The court considered the service plan and reports filed from LSSI and the CASA/GAL. The goal remained return home within 12 months, and the court found that Mother made reasonable and substantial progress and made reasonable efforts toward returning the minors home.

¶ 21    LSSI's July 12, 2024, permanency review report noted that Mother's juvenile case for Severide had closed. The report stated that Mother's visitation changed to unsupervised overnight visits. Following these visits, the minors reported, on more than one occasion, that Jessie yelled at Mother and stated that he would not interact with them. When LSSI addressed these concerns with Mother, she stated that the minors misunderstood the situation and denied any issues. She said she felt "safe" with Jessie in the home, but she was also "afraid" to inform Jessie of any changes to visitation. As a result of these concerns, visitation was changed back to supervised visits until everyone engaged in family therapy to address the issues. Mother was also recommended to resume individual counseling in addition to family therapy.

¶ 22    The report also noted that during a meeting on July 2, 2024, Mother reported that Shirl was "dead to [her]", but the following day, Mother reached out to LSSI stating that she wanted to "sign [her] rights over" to Shirl. LSSI requested a meeting with Mother to discuss this change and her desire for the minors to live with Shirl. However, that meeting had not happened due to scheduling issues.

¶ 23    The circuit court held a permanency hearing on July 15, 2024. Mother appeared. The court considered the service plan and report from LSSI. The goal remained return home within 12 months, and the court found that Mother had made reasonable efforts toward returning the minors home. However, the court found that Mother had not made reasonable and substantial progress toward the goal.

7

¶ 24    LSSI filed a permanency review report on August 14, 2024. The report stated that LSSI requested that all parties engage in family therapy, but due to Jessie's refusal to participate in the case further, the agency was considering its next steps. Mother stated she wanted to engage in individual counseling again but had not done so. The agency continued to monitor for the need to re-refer Mother for domestic violence services due to reports from the minors. Mother also continued to tell LSSI that she wanted Shirl to have guardianship of the minors, and when asked why, Mother stated she was "not in a place to care for them." When questioned why Mother could care for Severide but not the minors, she stated it was because of the size of her home. Family therapy was again recommended.

¶ 25    As to visitation, Mother canceled two visits due to lack of transportation and declined LSSI's offer of a bus pass or other public transportation. Visits were also moved back to the agency office due to a report of a bruise on Dakota's arm from Mother. The report stated, "In almost every visit there are a few concerns brough to LSSI's attention." Jessie and Severide did not participate in visits due to the need for family therapy to address ongoing issues first.

¶ 26    The CASA/GAL filed a report on October 16, 2024. In addition to information on the minors' wellbeing and progress, the report also stated that the minors did not feel safe with Jessie around, and that Mother was not "stable enough to have the children return home to her care at this time." The CASA/GAL again recommended Mother enroll in parenting programs to provide support for her and learn how to make the minors a priority.

¶ 27    LSSI filed a permanency review report on October 17, 2024. The report stated that Mother was no longer in a relationship with Jessie and that she reported obtaining an order of protection (OP) against him. LSSI, however, was not able to obtain a copy of the OP from Mother or public records. Mother stated that she moved but did not provide an updated address or phone number.

LSSI attempted to make contact through her previous address with no success. Mother, however, told an LSSI employee that she may re-engage in a relationship with Jessie.

¶ 28    For services, Mother was not consistent in contacting the agency for random drug drops. For mental health services, family therapy continued to be recommended and while Mother stated that she desired to continue individual counseling, she still had not scheduled or attempted to schedule any sessions. LSSI recommended individual counseling to address parenting and protective factors, due to her interactions with the minors becoming "increasingly inappropriate." Due to the self-reported OP, further domestic violence services were recommended.

¶ 29    Visitation was scheduled for two hours every week, but the report noted that Mother had been inconsistent in attending. Mother again stated that she had transportation issues; LSSI provided transportation when possible, but Mother became "upset and angry and started yelling" when the agency was unable to provide transportation for every visit. Mother also did not return phone calls to the agency. During the visits that did occur, Mother was reported to be "disconnected," attempted to leave early to give Jessie money, did not interact with the minors equally, and showed signs of physical aggression toward the minors.

¶ 30    The circuit court held a permanency hearing on October 21, 2024. Mother appeared. The court considered the service plan and reports filed by LSSI and the CASA/GAL. The goal remained return home within 12 months. The court found that Mother had not made reasonable and substantial progress or reasonable efforts toward returning the minors home.

¶ 31    LSSI filed a permanency review report on December 13, 2024. The report stated that LSSI did not have Mother's current address, and she was in a relationship with Jessie again. Her relationship with Jessie was a "concern" due to a high risk for domestic violence. For services, LSSI stated that new concerns for substance abuse occurred due to Mother stating in the dismissed

9

OP case that Jessie utilized illicit substances as a way to control her. As such, drug drops were requested, but Mother failed to appear. LSSI requested to meet with Mother to address the need for a re-referral for an assessment, with no success.

¶ 32    For mental health, LSSI continued to recommend family therapy, as well as individual therapy for Mother. She did not make any attempts to schedule sessions or meet with LSSI to address this need, despite requests. For parenting, LSSI continued to recommend individual counseling to focus on her parenting and protective factors because she minimized the concern about Jessie's interactions with the minors. Another parenting capacity assessment "would be beneficial" to identify which areas Mother needed the most support. For domestic violence, LSSI recommended that Mother re-engage with individual counseling sessions, but Mother had not maintained consistent contact with the agency to discuss further services.

¶ 33    Due to inconsistent visitation, Mother was to confirm visits with LSSI two days prior to the scheduled time. Failure to do so would result in the visit being canceled. Mother did not maintain consistent contact with the agency, and visits did not occur. McKayla expressed that she did not want to attend any visits with Mother, only her siblings. LSSI required Mother to meet with the agency to discuss visitation before any more visits were scheduled.

¶ 34    LSSI filed another permanency review report on January 2, 2025. The report stated that Mother provided her current address, where she lived with Jessie. Mother continued to fail to appear for drug drops and had not scheduled any individual counseling sessions. Mother did not maintain consistent contact with the agency to discuss further services for domestic violence. Mother emailed LSSI to schedule visitation, but the agency informed her that she needed an in-person meeting to discuss her service plan, address outstanding referrals, develop a visitation plan,

and review visit expectations before any visits could resume. Mother had not responded at the time of the report.

¶ 35 On January 8, 2025, the State filed a motion in each minor's case seeking a finding of unfitness and termination of the parental rights of Mother and Father. Count I alleged that Mother was unfit pursuant to section 1(D)(b) of the Adoption Act in that she failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minors. 750 ILCS 50/1(D)(b) (West 2022). Count II alleged that, pursuant to section 1(D)(m)(i) of the Adoption Act (*id.* § 1(D)(m)(i)), she failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minors. Count III alleged that, pursuant to section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)), she failed to make reasonable progress toward the return of the minors during any nine-month period following the adjudication of neglect or abuse, namely April 6, 2023, to January 6, 2024.

¶ 36 LSSI filed a permanency review report on February 13, 2025. The report stated that Mother was no longer in a relationship with Jessie due to an incident of domestic violence in January 2025. Jessie was incarcerated for domestic battery as a result. Mother was residing with Shirl. Mother completed the consent forms for substance abuse, mental health, parenting, and domestic violence on January 23, 2025, and she would be recommended services depending on the results of the assessments of each area. At the time of the report, Mother had not yet engaged in any of the recommended services but did schedule an intake appointment for a mental health assessment. Visitation was scheduled for two hours a week, and one visit had occurred.

¶ 37 LSSI filed a permanency review report on April 8, 2025. Mother had not yet completed the assessments for substance abuse or mental health. There was a mailing error from DCFS for the parenting referral, but a corrected referral was sent the day the report was filed. Mother stated she

11

wanted to continue individual counseling with her previous counselor, but a referral was not needed and LSSI requested confirmation of her enrollment in services.

¶ 38    Mother had three visits with the minors. All three minors attended the first visit, only Marcus attended the second, and all three minors attended the third, but the visit ended early due to Mother's behavior toward McKayla for refusing to attend the second visit. The visitation notes stated that McKayla only completed visits to see Dakota, and since she was out of town during the second visit, McKayla refused to attend. At the third visit, Mother questioned McKayla about her lack of attendance, stating, "Well if that's how you feel, I just won't come to visits anymore."

¶ 39    The State filed an amended motion, in each minor's case, seeking a finding of unfitness and termination of parental rights for Mother and Father on April 15, 2025. The motion contained the same three counts, but the dates of count III were amended to April 4, 2024, to January 6, 2025.

¶ 40                                   B. Unfitness

¶ 41    The matter proceeded to an unfitness hearing on May 6, 2025. The State first asked the circuit court to take judicial notice of the adjudication and dispositional orders, Mother's admission and stipulation of neglect in all three juvenile cases, the OP against Jessie, and the subsequent motion to dismiss the OP. The court took judicial notice of the adjudication and dispositional orders, the OP, and the motion to dismiss. The OP and motion were included as exhibits.

¶ 42    The State called Deputy Schoonover of the Champaign County Sheriff's Office (CCSO). Over objection from Mother's counsel, Deputy Schoonover testified that on January 18, 2025, he was dispatched to an apartment where he made contact with Jessie and Mother. Deputy Schoonover stated that Mother told him that a domestic dispute occurred that day, and she detailed ongoing issues, both physical and verbal, with Jessie for some years now. Deputy Schoonover

12

testified that CCSO had a history of reports and calls associated with that address. When he arrived, a two-year-old was also present at the residence with Mother and Jessie.

¶ 43   On cross-examination from the GAL, Deputy Schoonover testified that Jessie said he "stayed" at the house and his name was associated with the residence. Mother confirmed that she lived at the residence, and Deputy Schoonover testified that it was his understanding that they resided together. He also testified that Mother reported several years of ongoing domestic disputes.

¶ 44   The State then called Sedia Green, a former caseworker for LSSI. Green testified that she was the caseworker for the minors beginning September 4, 2024, until March 7, 2025, and she reviewed the prior caseworker's file when she began the case. As to Mother's involvement, she was to complete mental health, parenting, substance abuse, and domestic violence services. Mother did not complete the random drug drops, and Green was unable to contact her on several occasions. Green attempted to contact Mother through Jessie's phone number until she provided another number. Green believed Mother lived at Jessie's residence until December 2024 when she informed the agency she had moved.

¶ 45   As to visitation, Green testified that the visits were not consistent and were put on hold in December 2024 because the agency could not make contact with Mother. Green also detailed a report from McKayla in October 2024 that Mother put her hand over McKayla's mouth and would not let her go. Green was unable to make contact with Mother during this time to inquire about the incident due to unanswered phone calls.

¶ 46   Green further testified that Mother was living with Jessie, and he was uninterested in participating in the case, as a previous caseworker had recommended family therapy. Mother did not engage in individual therapy while Green was the caseworker, and Green was unable to make a referral for individual therapy due to being unable to contact Mother.

13

¶ 47    Green testified that Mother did not have a vehicle to attend visits, so the agency offered her gas cards as well as a bus pass for public transportation, but she did not accept them. The agency did provide transportation to Mother at some points, but when that was not available, public transportation assistance was offered. Green testified that Marcus and McKayla expressed that they did not like how Mother spoke to them, and they no longer wanted to attend visits with her.

¶ 48    Green testified that she became aware of the OP filed by Mother against Jessie, but Green did not speak to Mother about the OP because she was unable to make contact with her. As of January 6, 2025, the minors were not close to returning to the care of Mother due to a lack of consistency as well as not re-engaging in services, such as parenting classes and domestic violence.

¶ 49    On cross-examination from the GAL, Green testified that Mother lived with Jessie up until his arrest in January 2025. Green testified that Mother needed to re-engage in services because "she had fell back basically" in that she did not keep consistent contact with the agency, her interactions with the minors continued to become increasingly inappropriate, and the agency was concerned about domestic violence from Jessie. Green stated that Jessie told the agency he did not wish to participate in any requested services.

¶ 50    On cross-examination from Mother's counsel, Green testified that she did not meet Mother in person until the December 2024 hearing. Green stated that she met with Mother for their first child-family team meeting in mid-January. As to Mother's address, Green learned through a case aide that Mother moved to a trailer somewhere, but Green stated she heard of the move in October but then clarified that it would have actually been in December. In September, Green and her supervisor, Katie Arnold, went, unannounced, to Mother's listed address with Jessie, and no one was home.

14

¶ 51   Green testified that the official re-referral for Mother's services occurred in January 2025 when she came to the office to sign consent forms. Prior to this, Green had been unable to make contact with Mother to give the re-referrals. Green clarified that the previous caseworker attempted to communicate with Mother to give official referrals again for services, but Green was unable to communicate with Mother about the recommended services. Green further stated that she did not go to the address of the trailer because her supervisor instructed her not to do so due to Jessie having a gun, which posed a safety risk. Green testified that for the period she was the caseworker, Mother was to engage in visitation, and re-engage in the case to complete parenting, domestic violence, mental health, and substance abuse services.

¶ 52   On redirect from the State, Green testified that Mother was asked to re-engage in services due to signs of domestic violence and inconsistency with the agency. Green stated that she spoke to Mother on the phone about visitation and drug drops, as well as Mother's desire for the minors to be returned to Shirl around December 2024.

¶ 53   On redirect from the GAL, Green testified that she attempted to contact Mother through her own phone number and Jessie's. Green would call multiple times and leave messages, but Mother often called the main line for LSSI instead of Green's direct line and they would play "phone tag."

¶ 54   The hearing was continued until July 28, 2025. The State called Klarissa Johnson, a former child welfare assistant with LSSI who was employed there from July 2024 to May 2025. Johnson supervised visits between the minors and Mother. The visits were two hours and occurred at the LSSI office, a local park, Shirl's house, and one visit at Mother's residence in September 2024. Johnson recalled the visit at Mother's house and stated that after McKayla and Dakota had a disagreement, Mother restrained then eight-year-old McKayla on the couch in a "bear hug."

Johnson contacted her supervisor to confirm that Mother was not allowed to restrain the minors, and Johnson ended the visit.

¶ 55    Johnson testified that Mother was supposed to confirm her visits ahead of time, but she often failed to do so. For the visits that did occur, Johnson said the interactions between Mother and the minors were "distant" and "emotionally charged negatively." She stated that McKayla and Dakota would often become upset because Mother spent more time with Marcus during the visits. Marcus expressed disappointment from the visits or missed visits from Mother, and McKayla stated she no longer "felt safe" going to visits. Both Marcus and McKayla told Johnson that they did not like the way Jessie treated Mother.

¶ 56    Johnson stated that during one visit, she picked Mother up and Mother smelled of marijuana byproducts, and her eyes were "very glassy and red." Johnson testified that Mother would raise her voice at the minors if they did not listen.

¶ 57    On cross-examination from the GAL, Johnson testified that during one visit, Mother grabbed Dakota by the arm and Johnson later observed a thumb-sized bruise on her where Mother grabbed her. Johnson stated that if Mother did not confirm a visit, it would transition to a sibling visit, and the minors would become upset due to her not attending. When visits did occur, Mother would frequently be on her phone, talking or texting.

¶ 58    On cross-examination from Mother's counsel, Johnson stated that for visits, she would pick up the minors and take them to the location. Johnson recalled visits when she had to intervene, particularly the visit when Mother grabbed Dakota, and another visit when Dakota picked up Mother's nicotine vape and Mother did not stop Dakota from having it.

¶ 59    The State called Katie Arnold, LSSI supervisor, to testify. Arnold was the supervisor from when the case opened until May 2025. Arnold testified that Mother completed parenting and

16

substance abuse assessments prior to the opening of this case through her other juvenile case, and LSSI additionally recommended chaperone and domestic violence classes. Mother completed the domestic violence classes in early 2024, but it was re-added to her service plan at the end of 2024 due to concerns with Jessie and domestic violence in the home in October 2024. The re-referral did not happen at that time due to Mother's lack of consistent contact with the agency.

¶ 60    Arnold testified,

> "[Mother] was just difficult to contact. Her phone number changed frequently. I know there was a point in time where her e-mail changed as well. We had made several attempts—unannounced visits at her home and were unable to make contact. It was really just kind of that lack of ability to make and then maintain contact."

Arnold stated that she went with the caseworker to Mother's listed address in August or September 2024 to attempt to make contact with her but was unsuccessful.

¶ 61    Arnold stated that around March 2024 Mother had unsupervised overnight visits, but in July 2024 those were "pulled back to agency supervised due to concerns that were being expressed by the children about how the visits were going." By late August or early September 2024 Mother stopped visits altogether and the agency requested that she had an in-person meeting to address concerns with the case. Visits did not restart until about February 2025.

¶ 62    Arnold stated that when she spoke with Mother about the concerns expressed by the minors about Jessie and his actions, Mother said that the minors were "misinterpreting the situation." Prior to re-referring for domestic violence classes, family therapy with all parties was recommended, but Jessie declined to participate. Arnold testified that Mother was informed that Jessie's refusal to participate could have an effect on the case during child and family team meetings.

17

¶ 63    Arnold testified that due to inconsistent attendance and communication from Mother, she was required to confirm all visits before they occurred beginning in August 2024. Arnold learned of the Mother's OP against Jessie in late October or early November 2024 and obtained a copy from the court. Arnold attempted to meet with Mother after learning of the OP to discuss further services but was unable to reach her. The agency was focused on domestic violence, substance abuse assessment, and individualized therapy.

¶ 64    Arnold stated that in early January 2025 the agency was not close to returning any of the minors back to the care of Mother because she had, "virtually no contact with the agency. If she did reach out, it would be outside of office hours. We would return her phone calls and be unable to make contact with her. And we were still attempting to meet with her to set up referrals and a visitation schedule."

¶ 65    On cross-examination from the GAL, Arnold stated that the last visit Mother had with the minors was a phone call in October 2024 and it was not a "positive interaction." The phone call was ended early after Mother told McKayla that Mother was not sure if she should even "be working to get McKayla back anymore."

¶ 66    On cross-examination from Mother's counsel, Arnold testified about her concerns with Mother's relationship with Jessie due to him not being supportive of the minors returning home. Arnold said that family therapy was not formally referred as a service due to Mother's lack of cooperation and communication with the agency and Jessie's refusal to participate. Visitation was put on hold from October 2024 until the agency could meet with Mother to discuss services and visitation. Arnold said that family therapy was not pursued due to the minors needing individual therapy because of emotional and behavioral concerns.

¶ 67    On redirect examination, Arnold said that Jessie was considered a household member because he lived with Mother, and he would have to be part of the family therapy. Jessie was a "big part" of why unsupervised visits were removed from the home.

¶ 68    The hearing continued to July 29, 2025. The State then called Zaadahn Frazier, a former caseworker for LSSI from January 2023 to August 2024. When Frazier became the caseworker, Mother had unsupervised overnight visits which were later "pulled back" due to concerns from the minors and the visits were then held in the community. At that time, Mother was consistent with her communication with the agency and doing well. Mother denied any domestic violence occurring from Jessie at the time. Frazier again confirmed that family therapy did not occur due to Jessie's refusal to cooperate in the case. Frazier recalled, around August 2024 Mother stating that she and Jessie were having issues and Mother could not care for the minors. When Frazier left the case in August 2024 the agency was not close to returning the minors to Mother's care due to domestic violence concerns.

¶ 69    On cross-examination from the GAL, Frazier confirmed that visitation was reduced due to domestic violence and that Mother expressed that she was afraid of Jessie. Frazier also stated that Mother wanted to re-engage in individual therapy, and a referral was not needed for her to schedule more sessions, but Mother never set up any sessions. The State presented no further witnesses.

¶ 70    Mother then testified on her own behalf. At the beginning of her testimony, the circuit court agreed to take judicial notice of the permanency order from Severide's case, restoring custody to Mother and Jessie, as requested by Mother's counsel. Mother then testified that in April 2024 supervised visits with the minors were two hours a week, in the community or at the office. Mother said that she completed all of her recommended services in April or May of 2024.

19

¶ 71     Mother said she had three overnight visits with the minors before they ended due to "car trouble." Mother said the overnight visits occurred in August 2024. Mother would pick Marcus and McKayla up from their foster mother and then pick Dakota up from daycare.

¶ 72     Mother recalled emailing supervisor Arnold in June of 2024, asking Arnold to reconsider the overnight visits because the minors "blew it out of proportion." Mother stated that she spoke with Marcus's and McKayla's foster mother on July 27, 2024, to try to help her re-establish overnight visits through Arnold.

¶ 73     As to the event that led up to overnight visits being ended, Mother stated that on July 23 or 24, 2024, she picked up Marcus and McKayla, and while driving to pick up Dakota, she realized the minors did not have their medication, so she turned around to get it from their foster mother. The car began having issues, so the foster mother came to help. Mother said she was afraid to tell Jessie about the car issues because he would say the minors would need to go back to their foster homes and that "he would take his anger out on [her] later." Mother's sister, Jamie, picked Mother and the minors up and took them to Mother's residence. Overnight visits stopped after that incident.

¶ 74     Mother testified that she completed domestic violence classes in March 2024 and as a result, she was aware that her relationship with Jessie was problematic. She stated that she did not leave him because he was controlling and blackmailing her, to the extent that he made Mother sign a notarized document that said if she and Jessie separated, he would have full custody over Severide.

¶ 75     Mother stated that in October 2024 she and Jessie moved into a trailer in Urbana. She moved with him because she financially had to, and Jessie threatened to remove Severide from her if she did not move. Mother stated that LSSI said it would provide her with housing vouchers to

20

relocate, but they "never told [her] anything" further. Mother testified that Frazier was easy to get in contact with, but Green was not. Mother said she did not provide the exact address of the new trailer to LSSI.

¶ 76 Mother disagreed with caseworker aide Johnson's testimony that she spent more time with Marcus than with McKayla and Dakota. She also stated she never smoked marijuana before a visit. As to the incident when Johnson ended a visit early due to Mother restraining McKayla, Mother testified, "I did not bear-hug her. I just gently wrapped my arm around [McKayla], leaving her arms free and her legs free." Mother also denied grabbing Dakota's arm during a visit. Mother said that during visits, the minors would get along fine until they started "acting up" and Mother would try to calm them down. Mother denied ever having a nicotine vape during visits. Mother said that during the unsupervised visits, Jessie would sometimes yell at her to pay more attention to Severide than the minors, and restricted where the minors were permitted to go in the home so he could play a video game.

¶ 77 Mother said that when she called LSSI and requested the minors be placed in the care of Shirl, it was because Jessie had a gun to her head and told her to make the phone call. Mother did believe Shirl would be in a better position to care for the minors because of Mother's situation. Specifically, when the juvenile case involving Severide closed, Jessie made Mother "quit all the other services for this case," including visits and communication with the agency.

¶ 78 Mother testified that she knew she had to cooperate with the agency, but due to Jessie's influence, it was hard for her to do so. She did not see the minors from roughly December until late January. Mother could not move in with family due to lack of space and financial issues. Mother never filed anything in court to obtain custody of Severide because she believed the notarized document to be binding. Mother stated that Jessie physically abused her for three years.

21

Mother stated that she set up her own individual counseling sessions with her previous therapist, but LSSI never told her to re-engage in therapy again.

¶ 79    On cross-examination from the State, Mother stated that Jessie was only physically abusive toward her and not the minors. Mother stated that Jessie began holding the gun to her head during phone calls around June 2024. When the State asked why Mother did not include the information about the notarized document Jessie made her sign or that he held a gun to her head in the OP filed in September 2024 she only included the most recent events in September and "she couldn't remember every event that happened" because her mind was "just a scramble."

¶ 80    Mother stated that she completed parenting classes, and that during those classes, they addressed how to discipline and handle the minors. Mother expected, however, that the caseworker aide would assist in "how to control" the minors during visits, and that the parenting classes did not address how to handle minors with behavioral issues. Mother said that after the incident with the car issues, Jessie acted in an inappropriate way while the minors were there.

¶ 81    Mother testified that LSSI never provided her with housing vouchers. She also said that she told Arnold of her new address by calling the office. Mother said that she dismissed the OP against Jessie because she was being blackmailed over Severide. Mother said that when the minors told LSSI about their concerns for Mother and Jessie's relationship, their concerns were accurate. The parties presented no further testimony or evidence.

¶ 82    The hearing continued to August 11, 2025. The State proceeded to argument, stating that Mother was unfit under all three grounds. While Mother did make progress early on in the case, that progress stopped after the juvenile case involving Severide closed. As to the relevant time period, Mother was not engaged in the case, and visitation had been suspended. The State argued that Mother "chose, at the time, [Jessie] over" the minors, and while this was likely because of

Jessie's behavior, Mother was given the opportunity to learn how to deal with a domestic violence relationship through counseling and classes. Mother implemented her services for Severide but failed to do so for the minors in this case.

¶ 83    The State argued that Mother filed an OP against Jessie, which was granted, but she instead decided to have the OP dismissed. After the OP was dismissed in October 2024 visits with the minors were "nonexistent." The visitation before this point also showed issues with the minors being upset or disappointed after visits, and inappropriate behavior from Mother during the visits. The State argued that during the nine-month period alleged in the petition, Mother failed to maintain a reasonable degree of interest, concern, or responsibility, failed to make reasonable efforts, and failed to make reasonable progress. The State's witnesses testified that at the end of 2024 to the beginning of 2025, the minors were not close to being returned to Mother's care due to her relationship with Jessie causing unsafe conditions for the minors and affecting her progress in the case.

¶ 84    Mother's counsel argued that the State failed to meet its burden of clear and convincing evidence. Specifically, as to the nine-month period of April 6, 2024, to January 6, 2025, Mother was making reasonable progress at the beginning of that period and was permitted unsupervised visitation. Counsel stated that "things were not going well by January of 2025." Counsel argued that Mother was "trapped in an abuse relationship" during the nine-month period alleged and that Mother did not choose Jessie over the minors. A month before the time period, Mother's custody and guardianship in Severide's case was restored.

¶ 85    Mother's counsel then argued that LSSI did not provide the necessary resources and that the caseworkers were not consistent in their contact with Mother. Mother's communication and

involvement were prevented by Jessie, and since separating from him after an act of domestic battery, Mother would be able to participate again.

¶ 86    The GAL then argued that at the dispositional hearing on August 15, 2023, the circuit court included in its order that Mother had a pattern of "unhealthy relationships with men who present a danger to her children and then a failure to appreciate the problem and take action to protect the children." Mother's relationship with Jessie was abusive to her and the minors, resulting in the minors being fearful of him. The situation regressed during the nine-month period to the point of Mother having no contact with the minors. The GAL stated that domestic violence was present in their relationship, and Jessie was very controlling of Mother. However, Mother had a caseworker and an attorney to assist her in the case, including getting an OP against Jessie. Despite these resources, Mother made a decision to remain in a relationship and reside with Jessie, "who was a man that she and her children were afraid of and posed a danger to herself and her children." As such, the GAL argued that all three counts against Mother had been proven.

¶ 87    The circuit court stated that the evidence presented showed that Mother "made a series of really poor decisions that significantly impacted this case." The court specifically stated that Mother chose to remain with Jessie throughout this case despite multiple years of domestic abuse, the minors reporting feeling unsafe around him and that they did not like the way Jessie treated Mother, and Jessie's refusal to participate in the case. She chose to stop cooperating with her caseworker and services through the agency.

¶ 88    During visits, the visitation supervisor testified as to the issues Mother had, including "dividing her attention between the children, incidents of inappropriate discipline." While Mother denied these allegations, the court found the visitation supervisor's testimony to be more credible. The court stated that even if it was not her intention, Mother chose her relationship with Jessie

24

over the minors. Further, the case supervisor testified that at no point during the case was the agency "close at all to returning the children home" to Mother.

¶ 89　The circuit court found that the State met its burden as to all three counts. As to count I (reasonable degree of interest, concern, or responsibility), Mother failed to maintain a reasonable degree of responsibility as to the welfare of the minors due to the decisions she made. As to count II (reasonable efforts), Mother did not make reasonable efforts under the subjective standard because, "She knew better, and she chose even within those circumstances to make the choices that she did that negatively impacted the case." As to count III (reasonable progress), Mother did not make reasonable progress under the objective standard, noting that, "I don't think it's a close call. I don't think there's really any scenario here where [Mother] can persuasively argue at all that the efforts that she made in that nine-month period were objectively reasonable." The circuit court entered a written order finding Mother to be unfit on all three grounds the same day.

¶ 90　　　　　　　　　　　C. Best Interests

¶ 91　On September 26, 2025, LSSI filed a best interest report. The report stated that none of the minors have a bond with Mother, and that all of them expressed that they did not wish to see her again. The report detailed each element of best interest, stating that the minors' foster parents provided them with food, shelter, health, and clothing, they had strong bonds with their foster parents and a sense of security and familiarity in their homes, and living with their foster parents would provide permanence. The summary of the report was as follows:

> "The agency has no doubt that Marcus, McKayla and Dakota have thrived in their current placements. Their ability to maintain placement proves that they are happy and doing well. Marcus, McKayla and Dakota have all suffered trauma and have their ups and downs. Marcus is getting good grades and was on honor roll last year. McKayla is having

25

behavioral issues but is more stable than she has been prior to this placement and is working hard in therapy with the foster parent to strengthen their bond. Dakota has some behavioral problems but is stable and working on behavioral issues in therapy. These three children are in stable loving homes that only want the best for them."

¶ 92   The matter proceeded to a best interest hearing on September 29, 2025. The circuit court stated that it reviewed the report filed by LSSI. The State and GAL presented no further evidence or witnesses. Mother then testified on her own behalf. She first stated that she was the mother of Marcus (14 years old), McKayla (9), and Dakota (6). She stated that she could not remember the last time she saw the minors, and that was because her caseworker emailed Mother to inform her that the minors stated that they did not want to see her. Mother stated she did not believe that because she knew "deep down" the minors loved and adored her. Mother testified that she believed the minors should remain hers because "Nobody can love my children as much as I do." She additionally did not want the minors to be placed in two separate homes.

¶ 93   On cross-examination from the State, the State asked Mother how old Dakota was, and Mother again stated that she was six years old. However, the State informed Mother that Dakota was actually seven years old, and Mother said, "[All] I know is Dakota and McKayla is not too far apart." Mother said she did not believe that the minors said they did not want to visit with her, and she would not believe it from anybody unless the minors told her directly.

¶ 94   On redirect examination, Mother testified that she believed the minors were being influenced to say they did not want to see her. When asked why she had this concern, Mother said it was because Marcus's and McKayla's foster mother allows them to do things, like have a cell phone and gaming system, as well as try out for sports, that Mother did not believe to be "suitable" for the minors yet because they should "go outside, have fun, not stay cooped up." Mother said

26

that she did not think their foster mother should have told Marcus and McKayla the details of the domestic battery from Jessie. Mother did not think it was in the minors' best interest to terminate her rights.

¶ 95    The State proceeded to argument, stating that it agreed with the recommendation of the report to terminate Mother's parental rights. The State said that the minors had "lived through untold amounts of trauma and issues, and even today [Mother had] trouble accepting the reality of the situation, what her children want." The State said that Mother did not even know Dakota's age. The State argued that it would be in the best interests of the minors to terminate Mother's rights because they have all been with their foster families for multiple years where they feel safe, stable, and secure. The State said that despite the issues the minors face from their trauma, their foster parents were willing to continue working with them and providing for them, and that it would be in the minors' best interest to terminate Mother's rights.

¶ 96    Mother's counsel proceeded to argument, stating that the minors may have been influenced by other parties, potentially their foster parents or health care providers, to state that they did not want to see Mother anymore and that evidence was not presented directly from them to the court. Mother's counsel argued that she was sad that she had not seen the minors, and she had "legitimate concern" that Dakota was separated from her siblings. Counsel stated that it was not in the best interests of the minors to terminate Mother's parental rights.

¶ 97    The GAL proceeded to argument, stating that it was in the best interest of the minors to terminate Mother's parental rights. CASA had face-to-face visits with the minors in August and September of 2025, and the GAL testified,

> "It's very clear that these children are stable in their foster homes. They're living their best life as kids now. They've been through a lot of trauma at the hands of both their

27

parents. They're simply wishing to avoid drama and be kids. They don't even want to visit their mother right now."

The GAL stated that the minors were placed separately due to serious behavioral issues at the start of the case, and that they were all stable at the time of the hearing. The GAL asked that Mother's parental rights be terminated.

¶ 98 The circuit court stated that it considered the best interest report by LSSI and all evidence presented during the hearing. The court considered each factor of the Act, evaluating the impact with Mother and their foster placements.

¶ 99 For the physical safety and welfare of the minors, the foster parents provided physical safety, food, shelter, health, and clothing. The court expressed concern over Mother's ability to provide for their physical safety and welfare due to her relationship with Jessie posing a risk to Mother and the minors. As to the minors' development of their identity, the court noted that "each of these children have been able to positively develop their identity at real crucial ages during the time that they've been in foster care." Regarding the minors' background and ties, the court found that minors have developed bonds with their foster parents "based on the length of time they've been there and how well they're doing in each of those placements." For their sense of attachment, the court found that the minors developed attachment, where they feel love and a sense of being valued, from their foster parents. Regarding their sense of security, the minors all expressed concerns with their own safety with Mother, which was "very much in contrast" to their foster parents. For their sense of familiarity, the minors have a sense of familiarity with their foster placements and expressed that they did not want to visit with Mother any longer. The court also noted that when visits did occur, they were "distant" and "emotionally charged negatively." As to the continuity of affection, the court found that minors received and reciprocated the affection

28

from their foster parents and were doing well there. For the least disruptive placement, the foster parents expressed the commitment to provide permanency for each of the minors while Mother was "clearly not anywhere close to being in a position" to being a realistic placement alternative for the minors. With regard to the minors' wishes and long-term goals, all the minors expressed their desire to be adopted by their foster parents and continue sibling visits. Addressing the minors' community ties, the court stated that they all formed friendships and were ingrained in their schools. For their need for permanence, the foster parents committed to providing permanency. For the uniqueness of every family and minor, the minors all developed a unique identity through their foster parents. Addressing the risks attendant to entering and being in substitute care, the court found this risk to be very minimal due to the foster parents committing to permanency. As to the preferences of the persons available to care for the minors, Mother expressed a willingness to be available, but the court found she was not realistically available to care for them, while the foster parents expressed that preference as well and were in a position to be able to provide for the care of the minors.

¶ 100   After considering all the factors, the circuit court found that it was established by a preponderance of the evidence that it was in the best interest of the minors to terminate Mother's parental rights. The court entered a written order the same day. Mother timely appealed.

¶ 101                                    II. ANALYSIS

¶ 102   On appeal, Mother argues that the circuit court's findings that Mother (1) failed to maintain a reasonable degree of responsibility as to the minors' welfare, (2) failed to make reasonable efforts, and (3) failed to make reasonable progress were against the manifest weight of the evidence. Further, she argues that the circuit court's termination of her parental rights was against the manifest weight of the evidence. For the following reasons, we affirm.

29

¶ 103    Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 Act (705 ILCS 405/2-29(2) (West 2024)), which delineates a two-step process to terminate parental rights involuntarily. The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). 705 ILCS 405/2-29(2), (4) (West 2024); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds the parent unfit, the matter proceeds to a second hearing at which the State must prove that termination of parental rights is in the child's best interest. 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d at 352.

¶ 104    Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *Id*. at 364. Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *Id.* A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). In addition, because each of the statutory grounds of unfitness is independent, the circuit court's finding may

30

be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 105                                   A. Unfitness

¶ 106   In this case, the State alleged three grounds for unfitness: failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2024)); failure to make reasonable efforts to correct the conditions that were the basis for removal of the minor during any nine-month period (*id.* § 1(D)(m)(i)); and failure to make reasonable progress to correct the conditions that were the basis for removal of the minor during the nine-month period of April 4, 2024, to January 6, 2025 (*id.* § 1(D)(m)(ii)).

¶ 107   Section 1(D)(b) provides that a parent may be found unfit for "[f]ailure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare." *Id*. § 1(D)(b). Since the language of the statute is in the disjunctive, any one of the three individual elements, *i.e.*, a lack of a reasonable degree of interest *or* concern *or* responsibility may be considered by itself as a basis for unfitness. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31; 750 ILCS 50/1(D)(b) (West 2024).

¶ 108   Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the children from the parent and are judged by a subjective standard based on the amount of effort that is reasonable for a particular person. *In re Daphnie E.*, 368 Ill. App. 3d at 1066-67; 750 ILCS 50/1(d)(m)(i) (West 2024). The court must determine whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the children from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 109   Reasonable progress is judged by an objective standard based on the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie*

31

*E.*, 368 Ill. App. 3d at 1067. At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification, and reasonable progress exists when the circuit court can conclude that it will be able to order the child returned to parental custody in the near future. *Id.* However, a parent does not have an unlimited amount of time to make reasonable efforts or progress toward the return home of his children. *In re Grant M.*, 307 Ill. App. 3d 865, 871 (1999).

¶ 110    As to reasonable progress, Mother argues that at the beginning of the relevant period (April 4, 2024, to January 6, 2025) she was "headed for successful closure of this case," but due to Jessie's actions, the "bottom fell out" of the case. She further asserts that she was unable to engage in visitation fully due to abuse from Jessie. We reject this contention.

¶ 111    While Mother argues that she was "close" to having the minors returned home, the circuit court specifically stated that it relied upon supervisor Arnold's testimony that "at no point up to and including January 6 of 2025, was the department close at all to returning" the minors home to Mother. The circuit court also said that Mother could not "persuasively argue at all that the efforts that she made in that nine-month period were objectively reasonable." The court acknowledged the difficult situation Mother faced in her relationship with Jessie, but ultimately stated she made decisions that "put her relationship with [Jessie] over her children" during the relevant time period.

¶ 112    The evidence presented at the hearing and in the reports that the circuit court considered showed that Mother failed to make reasonable progress toward the goal of return home. During the relevant time period, Mother lost the privilege of overnight, unsupervised visits with the minors due to concerns from the minors about Jessie and how he treated them and Mother. Her communication with the agency and its employees became increasingly inconsistent. In October 2024 Mother made the decision to obtain an OP against Jessie, and it was granted; however, she

32

then decided to dismiss the OP and returned to her relationship with Jessie. Mother knew that the agency wanted all parties to engage in family therapy due to the minors' concerns about Jessie, but he refused to cooperate, and the family was never able to engage in this service. By December 2024 all visits were put on hold until the agency could speak to Mother and determine all necessary services, but they were unable to do so.

¶ 113   Based on these facts, the circuit court determined that the State proved by clear and convincing evidence that Mother failed to make reasonable progress during the relevant nine-month period. Evidence of a single statutory ground is sufficient to uphold a finding of parental unfitness. *In re T.Y.*, 334 Ill. App. 3d 894, 905 (2002). Accordingly, we conclude that the circuit court's finding that Mother was unfit was not against the manifest weight of the evidence. Because we may affirm the circuit court's finding of unfitness on this ground alone, we need not address Mother's remaining arguments concerning the other statutory grounds for her unfitness. See *In re Gwynne P.*, 215 Ill. 2d at 363.

¶ 114                                    B. Best Interests

¶ 115   Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d at 364. The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 116   In making a best interest determination, the court must consider, within the context of the child's age and developmental needs, the following factors:

33

" '(1) [T]he child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *Id.* ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d at 1072).

See 705 ILCS 405/1-3(4.05) (West 2024).

¶ 117 As with the circuit court's findings at the unfitness stage, we afford the circuit court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. We will not reverse the circuit court's best interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 118 The circuit court's best interest determination was supported by the record and was not against the manifest weight of the evidence. The minors had been in the same foster care placements since November 2023. While all the minors dealt with trauma and subsequent behavioral issues, their foster parents helped them with all their struggles and provided a home where their needs were consistently met. Both foster placements expressed a desire to adopt the minors. They were all also involved in their schools and communities. The circuit court very clearly detailed all the factors it considered in determining the minors' best interests, as discussed above. The court concluded that termination of Mother's parental rights served the minors' best interests.

¶ 119 We find that the State proved by a preponderance of the evidence that termination of Mother's parental rights was in the minors' best interests. The opposite conclusion is not clearly evident. As such, the circuit court's termination of Mother's rights was not against the manifest weight of the evidence.

34

¶ 120                    III. CONCLUSION

¶ 121   For the foregoing reasons, the circuit court's orders of unfitness and termination of Mother's parental rights are affirmed.


¶ 122   Affirmed.