*In re* T.Y. *et al.*, Minors, Respondents-Appellees (The People of the State of Illinois, Petitioner-Appellee, v. J.Y. *et al.*, Respondents-Appellants).

First District (2nd Division)    No. 1—00—3649

Opinion filed October 22, 2002.

Paul Karoll and Mary Raidbard, both of Chicago, for appellants.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Nancy Grauer Kisicki, and Nancy Faulls, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Charles P. Gilbert and Amina Saeed, of counsel), guardian *ad litem*.

JUSTICE CERDA delivered the opinion of the court:

Respondents, J.Y. and D.Y., appeal from the circuit court's termination of their parental rights. The trial court found that both parents had failed to make reasonable progress or efforts toward the return home of their children during any nine-month period after the end of the initial nine-month period following the adjudication of neglect or abuse; that the mother was unable to discharge her parental responsibilities due to her mental illness and would be unable to do so for a period extending beyond a reasonable time; that the father was a habitual drunkard; and that the father had failed to maintain a reasonable degree of responsibility for the children. Respondents argue on appeal that (1) the trial court erred in retroactively applying the amended statute, which allows the court to consider any nine-month period following the adjudication of neglect or abuse in determining whether the parents made reasonable efforts toward the return of their children; (2) the State did not prove that the father was unfit due to habitual drunkenness; and (3) the State did not prove that the mother was unfit due to mental illness.

## BACKGROUND

The mother, J.Y., and father, D.Y., are married and two of their three children are the subject of the neglect and abuse proceedings involved in this appeal. The daughter, T.Y., was born on January 27, 1990, and the son, T.Y., was born on November 25, 1987 (hereinafter T.Y. and T.Y. will be referred to as "the children").

On April 17, 1990, petitions for adjudication of wardship alleging neglect and dependency were filed for both of the children. The allegations of neglect were based on a lack of necessary care for the children's well-being and their exposure to an injurious environment; the allegation of dependency was based on the mental and/or physical disability of the mother. There was evidence that the case arose when J.Y. contacted the authorities, reporting that she was overwhelmed and was afraid she would hurt the children. Although the record is not clear, it indicates the petitions may have been amended on August 15, 1990, to add allegations of physical abuse.

According to a subsequent supplemental petition filed by the State, on September 13, 1990, the court made a finding of "neglect/lack of care" as to the girl and a finding of physical abuse as to the boy. The orders regarding these findings do not appear in the record.

On January 29, 1991, dispositional orders were entered finding that the parents were unable, for reasons other than financial circumstances, to care for, protect, train, or discipline the children. Both children were placed under the guardianship of the Department of Children and Family Services (DCFS).

Four months later, however, the parents were granted unsupervised visitation. Then, on October 9, 1991, the court found the parents were able to care for the children and the children were returned home under an order of protective supervision.

On December 16, 1991, the State filed petitions alleging that the parents had not cooperated with the reasonable requests of DCFS, that the father continued to physically and mentally abuse the mother, and that the father continued to use corporal punishment on the children. On April 24, 1992, the State filed additional petitions alleging that the mother had not provided all the care necessary for the children's well-being. The State also alleged that the mother had not cooperated with all reasonable requests of DCFS and she was using corporal punishment on the children.

On May 7, 1992, the court entered another dispositional order, finding that the girl had been neglected, and the court again placed her under DCFS guardianship. A dispositional order regarding the boy does not appear in the record, but there is no dispute that both children were again removed from the home in 1992. At the time of the children's removal, D.Y. was incarcerated for driving under the influence of alcohol, and the mother had been hospitalized for psychiatric reasons. The exact dates of the incarceration and hospitalization do not appear in the record.

Beginning September 7, 1995, unsupervised day visits between respondents and the children were allowed, but they were suspended

three months later. On June 13, 1996, a permanency goal of long-term foster care was entered by the court for all three children. The order found that the parents were visiting regularly and were involved in family counseling. The order noted, however, that a therapist smelled alcohol on D.Y.'s breath at February, March, and April visitations and that he needed to attend counseling and undergo urine screening. On January 13, 1997, the court ordered D.Y. to submit to random urine drops at least twice a month.

On January 12, 1999, the court entered a permanency goal of substitute care pending court determination of parental rights. Subsequently, on April 9, 1999, the State filed supplemental petitions requesting that respondents be found unfit, that their parental rights be terminated, and that the children be appointed a guardian with the right to consent to their adoption.

The petitions alleged that the parents had failed to maintain a reasonable degree of interest, concern, or responsibility for the children; that the parents had failed to protect the children from injurious conditions in the children's environment; that the parents had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children within nine months after the adjudication of abuse, neglect, or dependency, and/or failed to make reasonable progress toward the return home of the children within nine months after the adjudication of abuse, neglect, or dependency; that D.Y. was a habitual drunkard and/or addicted to drugs other than those prescribed by a physician for at least one year immediately prior to the commencement of the unfitness proceeding; and that the mother was unable to discharge parental responsibilities because of mental impairment, and there was sufficient justification to believe that the mother's inability to discharge parental responsibilities would extend beyond a reasonable time.

The fitness portion of the bifurcated termination proceeding began in December 1999. At the hearing, therapist Jodi Bessinger testified that she conducted sessions with D.Y. in October, November, and December of 1995. The purpose of the therapy was to work toward the return home of the children and to address the issues of domestic violence, substance abuse, parenting, and the mother's mental illness. At that time, D.Y. was not receiving treatment for alcoholism, he was not attending Alcoholics Anonymous (AA) meetings, and he denied that he had a drinking problem. Bessinger testified that D.Y. did not understand the scope of J.Y.'s mental illness or the children's attention deficit disorder. D.Y. did not understand the children's emotional needs or how to develop a loving and nurturing relationship with them. Bessinger characterized D.Y.'s bringing of gifts and money to

the children every visit as very disturbing. She believed that D.Y. did not take responsibility for any of the reasons that the children were removed from the home.

Bessinger also reported that respondents' daughter told her during therapy that sometime in 1995 or 1996 the children were in the car with D.Y. when they got into an accident. D.Y. was drinking at the time. The son also told Bessinger that his father kept a trash can next to his chair for his beer cans.

Susan Barry, the caseworker assigned to the children's case from September 1996 through February 1997, identified the main issues that D.Y. needed to address at that time: anger management, domestic violence, drinking problem based on several incidents of driving while under the influence, parenting skills, and a tendency to minimize the mother's mental illness. There was no evidence of the dates of the driving incidents.

Barry did not believe that D.Y. made progress in controlling his anger while she was assigned to the case. She based her opinion on the mother's concern that D.Y. would be upset, evidenced by comments such as, "He's not going to like this." However, the mother never said she was fearful of D.Y., and Barry never observed any explosive behavior.

Barry also concluded that, during her time on the case, D.Y. had not progressed in controlling his alcohol abuse. Although she admitted he complied with the required urine drops and was attending AA meetings, the children reported that he had openly consumed alcohol in front of them during an unsupervised visit. D.Y. did not deny that the incident had occurred. The children's foster parents further reported that they smelled alcohol on D.Y.'s breath when he returned the children to their home.

Barry observed the parents in 10 to 20 supervised visits. D.Y. participated in the visits and did things such as cook meals. She never saw D.Y. get angry or hit the children, nor did she ever see him drink alcohol or smell alcohol on his breath. Barry did not believe that D.Y. had more than a minimal understanding of the mother's mental illness.

Barry never recommended the return of the children to their mother because of the seriousness of J.Y.'s psychotic breaks and the reports of D.Y.'s drinking.

D.Y. and J.Y. were not receiving marriage counseling during the time that Barry was assigned to the case, as they stated they no longer needed it. However, J.Y. continued attending visits with a psychiatrist.

The court entered into evidence a service plan dated April 17, 1997, which rated D.Y. unsatisfactory for counseling and for submit-

ting to random blood screens. D.Y. was also rated unsatisfactory for another task; however, the meaning of the task is unclear: "Provide documentation from any referral sources who assess Mr. [Y] as not appropriate for treatment." D.Y. was rated satisfactory for signing a release of information concerning his participation and progress in counseling. The evaluation noted that the parents had not continued marital counseling. Finally, in an unsigned visiting plan, visits were rated unsatisfactory, noting "visits has [sic] not occurred 2 month [sic]."

Beginning in the fall of 1997, Dr. Jennifer Rolando, a clinical psychologist, conducted family-therapy sessions. Thirteen sessions were held; however, the children did not attend six of the sessions. The sessions focused on fostering an environment in which the parents could develop the necessary skills to meet the children's needs. D.Y.'s anger management was also addressed.

Although the children had been highly active and unfocused during the sessions, Dr. Rolando believed that they responded well to their parents' efforts to refocus them. Dr. Rolando observed that the parents had adequate parenting skills, they were receptive to learning and improving, they practiced new skills during sessions, they attended all of the sessions, they consistently followed through with service plans, and they exhibited a realistic view of the changes that would occur if the children returned home.

According to Dr. Rolando, the children had a good rapport with their parents and wanted to return home. The children stated that they felt safe in their parents' care. The parents demonstrated love for the children, and Rolando had no concerns regarding the children's safety. She believed that the ultimate goal should have been reunification, although the immediate goal should have been longer supervised visits and not return home.

A 1997 bonding assessment was entered into evidence, which was performed for D.Y. at the request of a caseworker. The examiner observed D.Y.'s interactions with his wife and children and then independently with each of the three children during an extended visit in the home. The youngest boy was 10, and the girl was 8 at the time. Both children stated a preference to live with their parents. The oldest child, S.Y., was living in a group home due to behavioral problems.

The assessment stated that D.Y. admitted to pushing his wife during an altercation, after she threatened to hit him with a chair; the date of the incident was not reported. It further stated that D.Y. had participated in AA for the past three years; he had attended three meetings a week for two years and one a month for the past year.

The report concluded that D.Y. was cooperative and engaged in the

bonding assessment process. D.Y. reported a strong desire to have his family reunited and put forth a significant amount of effort in interacting with his children. He attempted to help each of the children in different ways and tried to be attentive to their needs although, at times, his attempts were not well formulated. He also attempted to understand the children's point of view and feelings, but his interpretations were not always accurate. D.Y. exerted appropriate amounts of effort to parent his children and provide them with support. He also attempted to display affection to his children at various times.

According to the report, the three children displayed a very high level of activity and D.Y. demonstrated difficulty structuring their activities and keeping them engaged. It was noted, however, that the children had not been in the family home for an extended period of time, so their desire to investigate the home was understandable. The children displayed impulsiveness, distractibility, and poor coping skills, which made parenting difficult.

On a test requiring solutions to different parenting situations, D.Y.'s answers indicated that he was able to cognitively provide adequate solutions to many problematic situations. His responses indicated an ability to identify when the children needed reassurance.

The report noted that the family cared for each other and wanted to be together, but concluded that returning the children would be very difficult for the parents.

A July 1998 report from Dr. Rolando to the caseworker stated that the parents had demonstrated a passionate dedication to gain custody through unwavering pursuit over the last seven years. Rolando stated that five out of seven nights each week had been devoted to parenting activities, such as parenting classes, counseling, and visitation with the children. The parents had taken the initiative to arrange and pay for a number of required services without waiting for the system to make arrangements.

On October 5, 1998, D.Y. was evaluated by DCFS on an April 10, 1998, service plan. D.Y. was rated satisfactory for the following tasks: (1) maintaining stable housing with J.Y., which was free of observable hazards and safe for the children; (2) submitting to monthly random drug/alcohol screening; and (3) continuing to attend AA meetings regularly and submitting adequate documentation. D.Y. was rated unsatisfactory for visiting with the children on a regular basis and providing a work schedule. It was noted that telephone contact would be terminated if inappropriate conversation regarding the court process continued and that D.Y. was late or missed entire visits a majority of the time. Despite a July 1998 report from the family

therapist asserting the parents' understanding of necessary parenting skills, D.Y. was rated unsatisfactory for his progress in family therapy. The report also noted that D.Y. had not shown adequate progress in his anger management.

Diane Schmitz was the caseworker assigned to the case from July 1997 through September 1999, a time when the parents' visits were supervised. She observed 30 to 40 supervised visitations and the parents attended all the visits. She stated that the parents doted on the children, who reciprocated the affection. Schmitz further reported that J.Y. acted inappropriately during visits and was not able to demonstrate appropriate parenting. In addition, family therapy for J.Y. and the children was not beneficial because J.Y. would discuss inappropriate topics. J.Y.'s therapist recommended that individual counseling be terminated, and Schmitz concluded that J.Y. would not be able to parent the children due to her mental illness.

According to Schmitz, D.Y. arrived late to some of the visits and sometimes arrived in work clothes. During visits, D.Y. would become angry and raise his voice. At one visit in the fall of 1998, D.Y. yelled at Schmitz and raised his hand at her when she asked him not to send food home with one of the children. D.Y. did not show effective parenting or participate during the supervised visits.

In addition, during an administrative review meeting in October 1998, D.Y. became disruptive by interrupting and speaking loudly. His breath smelled of alcohol, and he refused to do a urine drop.

During Schmitz's assignment to the case, D.Y. provided sufficient documentation of his AA attendance and completion of individual therapy for alcohol abuse, domestic violence counseling, and parenting classes. He and J.Y. completed marital therapy once, but would not return when referred a second time. He also cooperated with all of the other urine screens, which were required once or twice a month. Schmitz did not feel that D.Y. had gained any insight from his alcohol abuse treatment.

Dr. Catherine E. Wilson, a clinical psychologist, testified that she performed a psychological assessment of J.Y. on September 8, 1999, pursuant to court order. Dr. Wilson diagnosed J.Y.'s mental illness as chronic bipolar disorder. She reported that the illness caused mood disturbances, resulting in severe depression at times and, at other times, inappropriately excited or hyperactive behavior. The illness could also cause psychotic symptoms. J.Y. had a history of severe depression as evidenced by a previous hospitalization following a suicide attempt. Dr. Wilson noted that during her examination, J.Y.'s thoughts went from one subject to another without connection, and she appeared to have trouble speaking due to the rapidity of her thoughts. As a result, J.Y. had difficulty answering questions.

Dr. Wilson opined that J.Y. was not able to exercise parental responsibilities and would not be capable of doing so in the foreseeable future. She further concluded that J.Y. could not manage an emergency situation, she could not meet her children's psychological needs, and she could not care for her children without supervision. There was a danger that J.Y.'s condition would deteriorate as a result of the stress of dealing with the children and that she might lose contact with reality.

Dr. Wilson did not examine D.Y., but reported that, if D.Y. was not aware of the mother's mental illness, he may not understand the need to supervise the mother's interactions with the children.

In his testimony, D.Y. admitted that he and J.Y. had an altercation in 1992 or 1993 during which he slapped J.Y. He stated that he attended about four years of anger management counseling and had learned coping skills, along with how to better adjust around people and how to control his anger. He believed in punishing the children by sending them to their rooms or, if they were very bad, he might "smack them on their butt *** with [his] hand a little bit."

D.Y. further testified that he was an alcoholic. He stated he quit drinking alcohol in 1995, reporting he drank once every two or three weeks in that year. He subsequently stated, however, that he "pretty much stopped" drinking in 1996, and then that he "tried it all the way up to [1999]." D.Y. reported that the last time he had a drink was a nonalcoholic beer four or five months prior to the December 1999 hearing. Other than nonalcoholic beer, he claimed he had not consumed alcohol during visitations. He had also attended AA since 1995.

Finally, D.Y. testified that he trusted his wife to supervise the children by herself, including in an emergency situation.

At the conclusion of the fitness hearing, the trial court found that Dr. Wilson's testimony was clear and convincing that J.Y. could not be trusted with the children within the foreseeable future due to her mental illness. Furthermore, D.Y. was unable to understand the seriousness of J.Y.'s mental condition. In part due to his alcoholism, D.Y. was unable to manage his anger, to properly care for the children, and to assist J.Y. The caseworker reports indicated that D.Y. had minimized both his drinking problem and J.Y.'s mental illness.

The trial court further found that in October 1996, D.Y. had openly consumed alcohol in front of the children. Subsequently, in October 1998, D.Y. had alcohol on his breath and refused to take a urine drop, thereby allowing the inference that he was under the influence of alcohol at that time. The court noted that the October 1998 incident was within the year preceding the hearing. The history of the case

showed that D.Y. had a drinking problem and was asked numerous times to complete alcohol treatment. Although D.Y. was in and out of alcohol treatment and did go to AA for periods of time, there was evidence he consumed alcohol as late as October 1998. The court stated that D.Y. still had the same problems he had in 1992. He continued to minimize his drinking problem and its effect on the children. The court found that D.Y. was a habitual drunkard for at least one year prior to the June 2, 1999, commencement of the unfitness proceeding.

The court also stated that D.Y. had failed to maintain a reasonable degree of responsibility for the children because he did not complete services, thereby failing to comply with the service plans. He also failed to stay sober, control his anger, recognize J.Y.'s mental illness, and assist J.Y.

The court concluded that the parents had made efforts but had not progressed to the point where they could be trusted with unsupervised visits. It stated that there was a lack of evidence establishing that the parents failed to make reasonable progress toward the return of the children in the first nine months after the adjudication of neglect. However, they failed to make progress during any nine-month period after the end of the initial nine months.

The trial court held that both parents were unfit, specifically finding: (1) they had failed to make reasonable progress or efforts toward the return home of the children during a nine-month period after the initial nine-month period following the adjudication (750 ILCS 50/1(D)(m) (West 2000)), (2) J.Y. was unable to discharge her parental responsibilities because of her mental illness and would be unable to do so for a period extending beyond a reasonable time (750 ILCS 50/1(D)(p) (West 2000)), (3) D.Y. was a habitual drunkard (750 ILCS 50/1(D)(k) (West 2000)), and (4) D.Y. had failed to maintain a reasonable degree of responsibility for the children (750 ILCS 50/1(D)(b) (West 2000)).

The best-interest hearing was held on September 18, 2000. At the hearing, the case manager testified that she had been assigned to the case since January 2000. Both children were diagnosed with "ADHD" and were taking medication. The children were living with a foster family and had developed a strong attachment to their foster parents' two teenage children. Although respondents had monthly supervised visits with the children, the case manager saw no strong emotional attachment between them. The case manager recommended that the parental rights be terminated.

The children's therapist testified that terminating respondents' parental rights would not be detrimental to the children's emotional state.

The trial court held that it would be in the children's best interest to terminate respondents' parental rights. A guardian was appointed with the right to consent to their adoption.

Respondents appeal.

## ANALYSIS

### Fitness of D.Y., the Father

■ D.Y. challenges only two of the three grounds upon which the court based his finding of unfitness. Due to his failure to challenge the trial court's finding that he was unfit for failing to maintain a reasonable degree of responsibility for the children under section 1(D)(b) of the Adoption Act, his appeal is moot. See *In re D.L.*, 191 Ill. 2d 1, 8, 727 N.E. 2d 990 (2000). Evidence of a single statutory ground is sufficient to uphold a finding of parental unfitness. *In re G.L.*, 329 Ill. App. 3d 18, 24, 768 N.E. 2d 367 (2002). Therefore, even if the court erred in finding D.Y. unfit under sections 1(D)(m) and 1(D)(k), the termination of his parental rights may be upheld solely on the grounds of section 1(D)(b). Although D.Y. does not challenge the termination of his parental rights under this section, we will briefly address the court's findings regarding a reasonable degree of responsibility.

■ Section 1(D)(b) of the Adoption Act provides that a parent may be found unfit if he fails "to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2000). In evaluating unfitness under this section, the court must focus on the parent's efforts and not the success of those efforts. *In re Adoption of Syck*, 138 Ill. 2d 255, 279, 562 N.E. 2d 174 (1990).

In this case, evidence was presented at the fitness hearing showing that D.Y. was late to, or did not attend, some of the visits with the children. Although it is unclear whether the reference was to both parents, there was an April 17, 1997, rating of unsatisfactory because visits had not occurred for two months.

In addition, D.Y. failed to appreciate J.Y.'s incapacity to parent due to her mental illness as evidenced by the testimony of therapists and by his testimony that he trusted his wife to supervise the children, even in an emergency situation. There was at least one incident of threatening or abusive behavior exhibited by D.Y. when he yelled and raised his hand at a therapist at a 1998 visitation. The same therapist reported that D.Y. often became angry and raised his voice at the children and did not participate in the visits.

Finally, the evidence showed that D.Y. was imprisoned for driving while under the influence of alcohol in 1992, his daughter reported to her therapist that D.Y. had been in a car accident in 1996 after

consuming alcohol, he openly consumed alcohol in front of the children at a visitation in 1996, and therapists smelled alcohol on his breath three times in 1996 and once in 1998 when he also refused to do a urine drop. D.Y., himself, testified that he quit drinking in 1995, then stated he "pretty much stopped" in 1996, then added that he "tried it *** up to 1999."

■ The trial judge found that D.Y.'s failure to complete services, his failure to control his alcoholism and his anger, and his failure to recognize J.Y.'s mental health problem all supported a finding that he did not demonstrate a reasonable degree of responsibility for the children. The trial court is in the best position to make factual findings and assess the witnesses' credibility. See *G.L.*, 329 Ill. App. 3d at 24. This court defers to those findings and will not reweigh the evidence. See *G.L.*, 329 Ill. App. 3d at 24. The court's finding that D.Y. was unfit due to his failure to demonstrate a reasonable degree of responsibility for the children was not contrary to the manifest weight of the evidence and the termination of his parental rights may be upheld on that basis alone.

## Fitness of J.Y., the Mother

J.Y. contends that the trial court erred in retroactively applying amended section 1(D)(m) of the Adoption Act in her and D.Y.'s case. 750 ILCS 50/1(D)(m) (West 2000). She also contends that the State did not prove her unfit due to mental illness.

■ The Juvenile Court Act of 1987 provides that, if the court finds clear and convincing evidence that a parent is unfit as defined by the Adoption Act and it is in the best interest of the minor that parental rights be terminated, the court may terminate parental rights and empower the guardian to consent to the minor's adoption. 705 ILCS 405/2—29 (West 2000).

■ Section 1(D)(m) of the Adoption Act was amended effective January 1, 2000, after the commencement of the fitness hearing in this case. Following the amendment, section 1(D)(m) stated:

"(m) Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or (ii) to make reasonable progress toward the return of the child to the parent within 9 months after an adjudication of neglected or abused minor under Section 2—3 of the Juvenile Court Act of 1987 or dependent minor under Section 2—4 of that Act, or (iii) to make reasonable progress toward the return of the child to the parent during any 9-month period after the end of the initial 9-month period following the adjudication of neglected or abused minor under Section 2—3 of the Juvenile Court Act of 1987 or dependent minor under Section 2—4 of that Act. If a service plan

has been established as required under Section 8.2 of the Abused and Neglected Child Reporting Act to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes (I) the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care within 9 months after the adjudication under Section 2—3 or 2—4 of the Juvenile Court Act of 1987 and (II) the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period after the end of the initial 9-month period following the adjudication under Section 2—3 or 2—4 of the Juvenile Court Act of 1987." 750 ILCS 50/ 1(D)(m) (West 2000).

Prior to the amendment, the statute did not permit a court to consider "any 9-month period," but only the nine months following the adjudication of neglect or abuse. 750 ILCS 50/1(D)(m) (West 1998).

Respondents argue that the trial court improperly applied the amendment retroactively and that the retroactive application adversely affected their parental rights.

■ A reviewing court should apply the law as it exists at the time of appeal unless doing so would interfere with a vested right. *First of America Trust Co. v. Armstead*, 171 Ill. 2d 282, 290, 664 N.E.2d 36 (1996). A vested right is a right that is protected from legislative interference by the due process clause of the Illinois Constitution. *In re S.W.*, 315 Ill. App. 3d 1153, 1156, 735 N.E. 2d 706 (2000). It is " 'an expectation that is so far perfected that it cannot be taken away by legislation.' " *S.W.*, 315 Ill. App. 3d at 1156, quoting *First of America Trust Co.*, 171 Ill. 2d at 290-91.

■ This court has previously found that a parent's right to his or her child is not an absolute vested right. See *S.W.*, 315 Ill. App. 3d at 1156 (amended section 1(D)(i) of the Adoption Act may be applied retroactively where the amendment was enacted after the petition to terminate parental rights was filed). In addition, the Fourth District Appellate Court has specifically held that "a parent's obligation to improve once his child is adjudicated neglected does not amount to a vested right to improve *in that period*." (Emphasis added.) *In re K.P.*, 305 Ill. App. 3d 175, 179, 711 N.E.2d 478 (1999). As a result, the Fourth District retroactively applied an amendment to section 1(D)(m), which reduced the 12-month improvement period to 9 months, when the amendment was enacted while the appeal was pending. *K.P.*, 305 Ill. App. 3d at 179.

■ As in *K.P.*, respondents here had no vested right to make reason-

able progress toward the return of their children in the initial nine-month period following adjudication. Section 1(D) provides a list of statutory grounds that will support a finding of unfitness; it is not a list of parental rights. *S.W.*, 315 Ill. App. 3d at 1157; *K.P.*, 305 Ill. App. 3d at 179. Therefore, the amendment to section 1(D)(m) was properly applied retroactively by the trial court.

■ J.Y.'s argument that the State failed to prove she was unfit due to mental illness is also without merit. Respondents contend that their expert, Dr. Rolando, was more reliable because she met with them to evaluate services intended for family reunification, whereas Dr. Wilson was merely hired to perform a psychological examination of J.Y.

Section 1(D)(p) provides that a parent is unfit where the court finds an "[i]nablity to discharge parental responsibilities supported by competent evidence *** of mental illness *** and there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period." 750 ILCS 50/1(D)(p) (West 2000). It is up to the trial court to make factual findings and assesses the credibility of the witnesses; this court will not reweigh the evidence on review. See *G.L.*, 329 Ill. App. 3d at 24.

Although Dr. Rolando opined that J.Y. was competent to parent, Dr. Wilson believed that J.Y.'s bipolar disorder, history of severe depression, suicide attempt, disconnected thinking, and precarious contact with reality when under stress rendered her unfit. The trial court was free to accept the testimony of Dr. Wilson over that of Dr. Rolando and did not err in finding that J.Y. was unfit due to mental illness.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

McBRIDE, P.J., and CAHILL, J., concur.