NOTICE
Decision filed 05/13/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250814-U

NO. 5-25-0814

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* S.R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois. | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22-JA-32 |
| | ) | |
| Taveon R., | ) | Honorable |
| | ) | Erick F. Hubbard, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Hackett and Clarke concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's judgment terminating respondent's parental rights was not against the manifest weight of the evidence where the State met its burden of proving that respondent was unfit to parent and that termination was in the best interest of the minor. Therefore, the judgment of the circuit court is affirmed.

¶ 2    The respondent, Taveon R. (Father),[1] appeals the Macon County circuit court's judgment terminating his parental rights over his minor child, S.R. On appeal, Father challenges both the finding of unfitness and the determination that it was in the minor's best interests to terminate Father's parental rights. For the reasons explained below, we affirm.

---

[1]S.R.'s mother was a party to case No. 22-JA-32 but is not a party to this appeal.

1

I. BACKGROUND

¶ 4     On February 15, 2022, the State filed a petition for adjudication of wardship regarding S.R., who was born in August 2020 and was approximately 17 months old at the time of the filing. The petition alleged S.R. was neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)) as a minor who was "under 18 years of age whose environment is injurious to her welfare, in that both parents have ongoing mental health issues that are not under control." The petition also alleged S.R. was abused under section 2-3(2)(ii) of the Juvenile Court Act (*id.* § 2-3(2)(ii)) as a minor who was at substantial risk of physical injury, by other than accidental means, because "both parents have ongoing mental health issues that are not under control."

¶ 5     A shelter care report prepared by the Illinois Department of Children and Family Services (DCFS) was filed on the same day. The report indicated that on February 14, 2022, DCFS received a report regarding S.R., and her siblings, G.G. (aged 2, born August 2019) and G.R. (approximately 3 months old, born November 2021),[2] after Marie J. (Mother) called the Decatur Police Department (DPD) and asked the police to buy her a new home and car because hers were possessed.

¶ 6     Shimeka Foster, a Child Protection Specialist (CPS) with DCFS, reported to the home of Mother and Father on February 14, 2022. Foster spoke with Sergeant Earles of the DPD, who reported that he responded to Mother's call. When Sergeant Earles arrived on the scene, Mother was yelling, "There is only one God," and Mother reported that God was speaking through her. A

---

[2]G.G. and G.R. are not parties to the present appeal. The shelter care report indicates that separate juvenile cases were opened for G.G. and G.R.

worker from Heritage Behavioral Health Center (HBHC) arrived at the home "to access [*sic*] [Mother]," and Mother agreed to go to the hospital for further assessment.

¶ 7    Foster attempted to interview Father, but he did not seem to understand what she was asking him. Foster noted that during the conversation, Father repeatedly lost focus, appearing "as if he was not in the room," and seemed disoriented. Father reported to an officer that he was receiving services at HBHC and had been seen by Theresa Taylor. When asked about Mother's behavior, Father stated that she was experiencing a spiritual awakening. When CPS asked Father to assist with dressing the minors, he began dressing S.R. in a snowsuit but paused just before zipping it, remaining motionless for approximately one minute.

¶ 8    Foster informed Father that they were removing the children from the home, and he replied, "okay." The three minors were taken into protective custody on February 14, 2022.

¶ 9    A shelter care hearing[3] was held on February 15, 2022. Father was present, and counsel was appointed to represent him in the matter. The circuit court found probable cause to believe the minor was neglected, abused, or dependent, and it was a matter of immediate and urgent necessity that the minor be placed in shelter care. A temporary custody order was entered on the same day.

¶ 10    On March 24, 2022, an initial family service plan was filed by DCFS. The report stated that Father had been diagnosed with schizophrenia and admitted that he was unable to care for the minor due to his mental health diagnosis.

¶ 11    The service plan recommended that Father complete services for substance abuse, parenting, mental health, domestic violence, and personal stability and cooperation. Regarding substance abuse services, Father was to complete a full substance abuse assessment with a

---

[3]A transcript of the February 15, 2022, shelter care hearing is not contained within the record on appeal. The information regarding this hearing comes from the circuit court's docket entry regarding same.

qualified service provider and follow all recommended services. Father was further required to submit to random drug screenings and refrain from substance use. As for parenting, Father was to complete a parenting pre-test and follow any recommendations. As to mental health services, Father was to follow all recommendations made by his mental health provider. Father was to complete a domestic violence assessment and follow all recommendations. Lastly, Father was to maintain safe and stable housing, maintain income, keep DCFS updated as to any address changes, meet with DCFS to ensure progress, and sign all releases.

¶ 12    On March 30, 2022, the adjudicatory hearing[4] was held. Father was present with counsel, and mother was present *pro se*. The circuit court heard witness testimony. The State withdrew count II of the petition for adjudication of wardship. The circuit court found the allegations of count I had been proven by a preponderance of the evidence, and found the minor was neglected. On April 11, 2022, the written adjudicatory order was entered. The order found the minor was neglected as a minor in an environment that is injurious to the welfare of the minor as defined by section 2-3(1)(b) of the Juvenile Court Act (*id*. § 2-3(1)(b)). The court noted the finding was based on the presence of mental health problems. The order further noted that the neglect was inflicted by both Mother and Father. A dispositional hearing was scheduled on April 20, 2022.

¶ 13    On April 13, 2022, a dispositional report was filed by DCFS. An initial child and family team meeting was held on March 23, 2022, to discuss the service plan recommendations. Mother and Father were both in attendance. Father was recommended "to engage in parenting services, mental health services, complete a domestic violence assessment, complete a substance abuse assessment, and maintain a goal of personal stability throughout this case." Father was also

---

[4]A transcript of the March 30, 2022, adjudicatory hearing is not contained within the record on appeal. The information regarding this hearing comes from the circuit court's docket entry regarding same.

4

required to keep in contact with DCFS workers and inform them of any changes pertaining to his living or employment situation. Both Mother and Father were required to comply with their visitation plan and provide safe and appropriate interactions during all visits.

¶ 14　The report stated that Mother and Father resided together in a two-bedroom home, which the worker observed to be clean and met minimal parenting standards. Father was not employed and was referred to family habilitation services for assistance.

¶ 15　Father was referred to parenting services through Webster Cantrell Youth Advocate (WCYA), and he completed a parenting assessment on April 6, 2022. Father was rated as high risk in all categories except in power roles, where Father tested in the medium risk range. Father was recommended for weekly parenting classes beginning on April 20, 2022.

¶ 16　Father was recommended to engage in mental health treatment to address his mental health diagnosis of schizophrenia. Father has been receiving medication via injections every three weeks at HBHC for his schizophrenia. Father's case manager at HBHC reported that Father has been compliant with his injections for three years. Previously, Father did not receive any other services from HBHC. Father was referred for counseling services at WCYA on April 7, 2022. The report noted, Father "has indicated that due to his mental health diagnosis, he is incapable of caring for the children on his own."

¶ 17　Father was also referred to a domestic violence offender's program due to a history of domestic violence. Additionally, Father was recommended to engage in a substance abuse assessment that had not yet been completed.

¶ 18　The report further noted that the minor had been diagnosed with Down syndrome and a heart defect. Mother and Father were both attending a weekly, two-hour visit with their children. Both parents had attended all scheduled visits since the case opening, and their interactions with

the children had been appropriate. The report recommended the goal of return home within 12 months.

¶ 19    A dispositional hearing[5] was held on April 20, 2022. Father was present with his counsel. Mother did not appear. The circuit court found it was in the best interest of the minor to make her a ward of the court, and guardianship was placed with DCFS. On April 25, 2022, the written dispositional order was entered.

¶ 20    On September 9, 2022, an initial permanency report was filed. Two child and family team meetings took place on May 24, 2022, and September 7, 2022. Mother and Father attended both. The meetings were to discuss their progress and/or lack of progress in services. Father's recommended services remained to be the following: "domestic violence perpetrator services, parenting, mental health services, complete a substance abuse assessment, and personal stability and cooperation."

¶ 21    As to parenting, the report stated that Father completed the intake and preassessment on March 23, 2022. Father was working on the Illinois Nurturing Parenting curriculum and had attended four of nine appointments. One appointment was canceled due to COVID-19 exposure, and the remaining three were no-shows.

¶ 22    Regarding mental health services, Father was referred to WCYA and was assigned to a therapist, but the services with her were closed due to Father not "making himself available for appointments." As of September 7, 2022, Father was on a waitlist for reassignment to a new counselor. Weekly counseling services were recommended to help mitigate any future concerns with Father's mental health impacting his ability to parent his children.

---

[5]A transcript of the April 20, 2022, dispositional hearing is not contained within the record on appeal. The information regarding this hearing comes from the circuit court's docket entry regarding same.

¶ 23    Father had failed to complete a substance abuse assessment. He had failed to appear for three random drug screens scheduled in May, June, and August.

¶ 24    As to domestic violence services, Father was referred to the "AWARE Program." At the time of the report, the reporter was "awaiting a response on worker assignment."

¶ 25    Regarding personal stability and cooperation, Father and Mother continued living together in a two-bedroom home that was clean and met minimal parenting standards. At the most recent child and family team meeting, Father informed the reporter that he obtained a phone and started stocking shelves at a store once a week.

¶ 26    On September 21, 2022, a permanency review hearing was held, and a permanency order was entered, which set the permanency goal as return home within 12 months. The order noted "parents off to slow start, but are making progress." The circuit court found Father had made reasonable efforts towards the return home of the minor, but had failed to make reasonable and substantial progress toward the minor returning home.

¶ 27    Subsequent permanency review hearings were held, although no permanency review hearing transcripts are present in the record on appeal, and permanency orders were entered on March 22, 2023, September 6, 2023, March 6, 2024, September 4, 2024, and March 5, 2025. In the five permanency orders that followed the initial permanency order, the circuit court found that Father had not made reasonable and substantial progress toward returning the minor home, nor had Father made reasonable efforts toward returning the minor home. The March 5, 2025, permanency order changed the permanency goal to substitute care pending the determination of termination of parental rights.

¶ 28    On March 13, 2025, the State filed a "motion seeking finding of unfitness and permanent termination of the parental rights" regarding Father and Mother. The motion alleged that Father was an unfit parent based on the following:

"4. That the [Mother] and father, [Father] and Unknowns are unfit persons within the meaning of Chapter 750, Section 50/1 of the ILCS as amended, because:

* * *

B. Pursuant to 750 ILCS 50/1(D)(b), [Mother] and [Father] have failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare;

* * *

D. Pursuant to 750 ILCS 50/1(D)(m)(i), [Mother] and [Father] have failed to make reasonable efforts to correct the conditions that were the basis of the removal of the minor from the parent during any 9-month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987;

E. Pursuant to 750 ILCS 50/1(D)(m)(ii), [Mother] and [Father] have failed to make reasonable progress toward the return of the minor to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: March 30, 2022—December 30, 2022;

F. Pursuant to 750 ILCS 50/1(D)(m)(ii), [Mother] and [Father] have failed to make reasonable progress toward the return of the minor to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: December 30, 2022—September 30, 2023;

G. Pursuant to 750 ILCS 50/1(D)(m)(ii), [Mother] and [Father] have failed to make reasonable progress toward the return of the minor to the parent during any 9 month period

8

following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: September 30, 2023—June 30, 2024;

H. Pursuant to 750 ILCS 50/1(D)(m)(ii), [Mother] and [Father] have failed to make reasonable progress toward the return of the minor to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: June 13, 2024—March 13, 2025."

¶ 29    On July 7, 2025, the circuit court held a fitness hearing. Laura Voyles, child welfare specialist for DCFS, testified for the State. Voyles stated that she had been the assigned caseworker to Father's case since October 2024 and had reviewed the file from before her assignment. Voyles testified that the case began in 2022 due to both parents' mental health issues. Father's service plan required that he engage in services for parenting, substance abuse, mental health, and domestic violence, maintain stability, and attend visitation.

¶ 30    Regarding parenting services, Voyles testified that Father initially began parenting services and attended with Mother. Between completing an intake in April 2022 through May 24, 2022, Father had attended four of nine scheduled parenting appointments. His attendance improved in June and July of 2022. The parenting instructor changed, and Father struggled with that in August and September 2022. Father and Mother ended their romantic relationship in November 2022 and stopped attending parenting services together. Father was arrested and jailed in December 2022 stemming from a domestic violence incident. He stopped attending parenting services after his arrest. Father did not reengage in parenting services upon his release from jail.

¶ 31    As to substance abuse services, Voyles stated that Father had been asked to complete a walk-in appointment at HBHC for a substance abuse assessment. Father never completed the

9

substance abuse assessment. Father only completed 1 of 10 drug screenings that he was scheduled for.

¶ 32    Turning to mental health services, Voyles testified that DCFS was aware at the time the case was opened that Father had a diagnosis of schizophrenia and he had been receiving medication injections at HBHC to treat his schizophrenia every three weeks. Father had been compliant with his medications for three years at the time the case began. A referral was made for Father to engage in counseling services. Father did not engage in the counseling services, and his referral was closed unsuccessfully. As of November 7, 2022, Father was no longer compliant with his medications.

¶ 33    With reference to domestic violence services, a referral was made in 2022 for Father to participate in the Aware program. Father was waiting for the Aware program to assign him a class time. Father did not complete domestic violence services. Additionally, Voyles testified that Father was arrested and jailed for domestic battery following a December 2022 incident involving Mother and was released on January 31, 2023, after pleading guilty to the offense. In March 2023 Father was arrested for a new domestic violence incident.

¶ 34    As to overall stability, Father had not engaged in any services since August 2023. Father had been in jail in December 2022, January 2023, and March 2023. Further, in the summer of 2023, Father was arrested for trespassing after he barricaded himself inside Mother's apartment, and "[a] SWAT team ended up getting called out because he had barricaded himself in." Voyles indicated that since August 2023 Father had either been in the custody of the Sangamon County jail or the Department of Health and Human Services, where he had been sent for treatment after he was found unfit to stand trial. Voyles testified that Father's previous caseworker lost contact with him in April through June 2023 due to his incarceration in Sangamon County jail. Regarding

Father's visitation, Voyles asserted that she was not certain the last time Father had visitation with the minor.

¶ 35 Mother then testified on her own behalf. Mother's testimony relevant to Father was limited to testimony that she and Father completed a substance abuse assessment at the same time.

¶ 36 Father then testified on his own behalf. Father agreed that he did not attend a substance abuse assessment at HBHC, and instead described a different location where he attended the assessment with Mother. Father testified that he last visited with the minor in 2023, prior to his detention in the Sangamon County jail. Father stated he had visited with the minor three times since 2023. Father testified that he had been incarcerated in the Sangamon County jail since August 2023 until he was transferred to Packard Mental Health Center in July 2024 after being found unfit.

¶ 37 At the close of Father's testimony, the court heard arguments. The State argued that, as to Father, it had proven the allegations of paragraphs 4B, 4D, 4E, 4F, 4G, and 4H (set forth in their entirety above). As to reasonable efforts, the State recognized that Father engaged in some services in 2022. However, since December 2022 Father had been in and out of custody and therefore had failed to make reasonable efforts to correct the conditions that led to the removal of the minor. Further, Father's mental health remained an issue. The State argued that Father failed to maintain a reasonable degree of interest, concern, or responsibility due to his minimal engagement with DCFS or the minor. As to reasonable progress, the State again cited to his time spent incarcerated stating that due to this, he was no closer to the minor being returned to his care as he was at the start of the case.

¶ 38 The guardian *ad litem* (GAL) argued that Father was unfit and unable to parent S.R. due to his frequent incarceration. Father argued that "the State has not proved any of the paragraphs involved with [Father] by clear and convincing" evidence.

11

¶ 39    The court made oral pronouncements finding that, as to Father, the State had met its burden as to paragraphs 4B, 4D, 4E, 4F, 4G, and 4H by clear and convincing evidence. The circuit court also entered an order via docket entry, finding that Father was an unfit parent for the previously mentioned reasons.

¶ 40    On July 23, 2025, a best interest report was filed. The report noted that the minor, who was four years old at the time, had been in the same foster placement since June 17, 2022. She was closely bonded with her foster parent, foster grandparents, and the surrounding community. The minor looked to her foster parent for comfort, play, enrichment, and safety. The foster parent had signed a permanency commitment on May 9, 2023, indicating that she wanted to adopt the minor and reaffirmed the commitment on April 25, 2025. The minor was very involved in her community, participating in tee ball, cheerleading, and soccer. The minor attended preschool where her medical needs were being met. The minor also attended an in-home daycare that "is highly knowledgeable of [S.R.'s] needs."

¶ 41    The report stated that the minor had several significant medical needs, including Down syndrome and a heart condition. The minor had a medical team in St. Louis, Missouri that she had been seeing for two and a half years. The minor's foster parent had consistently taken the minor to attend medical appointments. Further, the minor required close monitoring due to her medical needs and inability to vocalize. The report stated that the foster parent, "recognizes the importance of providing a child with a stable and nurturing home environment and is highly knowledgeable of [the minor's] medical needs." The report recommended changing the permanency goal to adoption.

12

¶ 42    On August 13, 2025, CASA filed a report to the court regarding the best interest of the minor. The report stated much of the same information as the best interest report, concluding that there were no concerns regarding the minor's placement.

¶ 43    On October 6, 2025, the court held a best interest hearing. Amal Al-Rashdan testified for the State. Al-Rashdan had been the caseworker for the minor at the Center for Youth and Family Solutions since January 3, 2025.

¶ 44    Al-Rashdan testified that the minor had several medical conditions, including Down syndrome, celiac disease, ventral septal defect with overlying tricuspid aneurysmal tissue, strabismus condition, intermittent esotropia of the right eye, mild sensorineural hearing loss, acid reflux, sleep apnea, red dye allergy, malicious malalignment, femoral retroversion, and internal tibia torsion. For these conditions, the minor required treatment at St. Louis Children's Hospital, where she saw several specialists, including a cardiologist, neurologist, and eye surgeon. The minor's foster parent scheduled the medical appointments and attended them with the minor. The minor also received additional speech therapy that her foster parent was originally paying for due to a wait list at institutions that accepted the minor's health insurance.

¶ 45    Al-Rashdan further stated that the minor attended preschool as well as day care, where her performance had improved. Al-Rashdan asserted that the minor's foster parent also works with the minor on education at home, for example, by providing booklets to help the minor with concepts such as shapes and colors. The minor's foster parent had also been teaching her sign language to improve her ability to communicate.

¶ 46    Al-Rashdan testified that the minor had a very close relationship with her foster parent, referring to her as "mom" and referring to her foster grandparents as "grandma" and "grandpa".

The minor also attended sibling visits that were organized by the foster parents. Al-Rashdan stated that the minor's foster parent had signed a permanency agreement.

¶ 47　At the close of evidence, the State argued that when considering the best interest factors, such as where the child feels valued and a sense of belonging, that was in her current foster placement. The minor was bonded not only with her foster parent but also with her extended foster family. Further, the foster parent "has clearly gone above and beyond for medical and educational needs for [the minor]." Further, the minor had been in her placement for three years and was very well cared for, with her physical, emotional, and educational needs being met. As to Father, the State argued that it was unknown when he will be released from his mental health facility and was not close to having the minor returned to his care. The State concluded that the minor's current foster placement was in her best interest so that permanency could be achieved.

¶ 48　Father's attorney argued that at this time it was unknown when Father will be released from Packard Mental Health Center and that the State had not proven by a preponderance of the evidence that it was in the best interest to terminate his rights. The GAL argued that while the minor's foster placement would be the best place for her regardless of her being medically fragile, her medical conditions emphasized the best interest factors the court must consider.

¶ 49　The circuit court noted it had to consider the best interest factors against the evidence presented. In its oral pronouncements, the circuit court noted that the minor was a now five-year-old special needs child with many medical conditions. She has been in her current placement for three years, the majority of her life. "The unrebutted evidence is that [the minor] has bonded greatly with [her foster mother] and [foster mother's] parents."

¶ 50　The court found that the following factors weighed in favor of terminating parental rights: "[t]he sense of familiarity, sense of security, where the child, again, actually feels love and

14

attachment, and the sense of being valued—that's all been established by the evidence that's been presented to this Court, as well as the continuity of affection for this child." The court added that the child's need for permanence and community ties favored termination.

¶ 51     The court found that the State had proven by a preponderance of the evidence that Father's parental rights should be terminated. The same day, the circuit court made a docket entry finding that it was in the minor's best interest to terminate Father's parental rights. The court also stated, "Judgment as to Parental Fitness and Permanent Termination to be filed." On October 9, 2025, Father filed a notice of appeal. The trial court entered the written "Judgment as to Parental Fitness and Permanent Termination" on December 15, 2025. Father's notice of appeal was treated as being filed on the date of December 15, 2025, and after the entry of the judgment.

¶ 52                                   II. ANALYSIS

¶ 53     On appeal, Father argues that the circuit court's findings that Father (1) failed to maintain a reasonable degree of interest, concern, and responsibility as to the minor's welfare; (2) failed to make reasonable efforts; and (3) failed to make reasonable progress were against the manifest weight of the evidence. Further, he argues that the circuit court's termination of his parental rights was against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 54     Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)), which delineates a two-step process to terminate parental rights involuntarily. The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). 705 ILCS 405/2-

15

29(2), (4) (West 2024); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds the parent unfit, the matter proceeds to a second hearing at which the State must prove that termination of parental rights is in the child's best interests. 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d at 352. Accordingly, we turn to the circuit court's finding that Father was unfit.

¶ 55                                    A. Unfitness

¶ 56    Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re D.T.*, 212 Ill. 2d at 364. Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *Id.* A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). In addition, because each of the statutory grounds of unfitness is independent, the circuit court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 57    Section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2024)) contains two separate grounds, either of which may uphold a finding of unfitness. Subsection (i) deals with a parent's failure to make reasonable efforts to correct the conditions that were the basis for the removal of the child, and subsection (ii) deals with a parent's failure to make reasonable progress

toward the return of the child during any nine-month period following the adjudication of the child as neglected or abused. A parent's failure to substantially fulfill their obligations under a service plan and correct the conditions that brought the child into care is considered failure to make reasonable progress toward the return of the child to the parent. *Id*. Here, the circuit court found Father unfit based on his failure to make reasonable progress toward the return of S.R. during the nine-month periods of March 30, 2022—December 30, 2022, December 30, 2022—September 30, 2023, September 30, 2023—June 30, 2024, and June 13, 2024—March 13, 2025.

¶ 58    Reasonable progress is judged by an objective standard based on the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification, and reasonable progress exists when the circuit court can conclude that it will be able to order the child returned to parental custody in the near future. However, a parent does not have an unlimited amount of time to make reasonable efforts or progress toward the return home of her children. *In re Grant M.*, 307 Ill. App. 3d 865, 871 (1999).

¶ 59    Evidence of a single statutory ground is sufficient to uphold a finding of parental unfitness. *In re T.Y.*, 334 Ill. App. 3d 894, 905 (2002). Thus, the circuit court's finding that Father failed to make reasonable progress suffices to establish that he was an unfit parent.

¶ 60    Here, the evidence supports the circuit court's finding that Father failed to make reasonable progress during the relevant nine-month periods. Father contends that the minor was removed due to Mother's mental health crisis and that termination was improper because he participated in services early in the case and his subsequent lack of participation was due to his incarceration.

17

¶ 61 The record reflects that Father's efforts were not sustained. Although he initially engaged in services at the start of the case, his participation later ended. His counseling referral was closed for lack of participation, and he completed only 1 of 10 drug screens, which was positive for marijuana. Following his convictions and incarceration, Father's participation in services and visitation ceased. While the minor was initially removed due to Mother's mental health, Father's own mental health later became a concern, and he stopped taking prescribed medication.

¶ 62 Further, Father contends that his later lack of participation in services and visits resulted from periods of incarceration. However, reasonable progress is an objective standard that should not be judged by the parent's subjective circumstances. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. While Father's failure to complete his service plan was, in part, due to his incarceration, the court is not to take his circumstances into consideration for his lack of progress. *In re J.L.*, 236 Ill. 2d 329, 343 (2010).

¶ 63 Because we must affirm the circuit court's finding of unfitness if the evidence supports any one of the statutory grounds alleged, including a failure to make reasonable progress during the relevant nine-month periods following the adjudication of neglect (see *In re C.W.*, 199 Ill. 2d at 217), we conclude that the circuit court's determination was not against the manifest weight of the evidence. After reviewing the record, we cannot say that an opposite conclusion is clearly apparent.

¶ 64                                  B. Best Interest

¶ 65 Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphasis in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination proceedings, the State bears the burden of proving

18

by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 66 In making a best-interest determination, the court must consider, within the context of the child's age and developmental needs, the following factors:

> " '(1) [T]he child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *Id*. (quoting *In re Daphnie E*., 368 Ill. App. 3d 1052, 1072 (2006)); see 705 ILCS 405/1-3(4.05) (West 2024).

¶ 67 As with the circuit court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. We will not reverse the circuit court's best-interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 68 The circuit court's best-interests determination was not against the manifest weight of the evidence. The minor had resided in the same foster placement since July 2022 where her needs were met, and stability was provided. The foster parent expressed willingness to adopt, and the minor was involved in school and community activities. The circuit court considered the relevant statutory factors and concluded that termination was warranted.

19

¶ 69 We find that the State proved by a preponderance of the evidence that termination of Father's parental rights was in the minor's best interests. An opposite conclusion is not clearly evident. As such, the circuit court's termination of Father's rights was not against the manifest weight of the evidence.

¶ 70                                    III. CONCLUSION

¶ 71 For the foregoing reasons, the circuit court's judgment as to parental fitness and permanent termination is affirmed.


¶ 72 Affirmed.